DEBORAH BURROW *et al.*, Plaintiffs-Appellees, *v.* EDITH WIDDER, M. D., *et al.*, Defendants.—(JOHN B. O'DONOGHUE, M. D., Defendant-Appellant.)

First District (5th Division)    No. 63048

Opinion filed September 2, 1977.

Wildman, Harrold, Allen & Dixon, of Chicago (Bernard E. Harrold, Harold W. Huff, and Kay L. Schichtel, of counsel), for appellant.

John D. Hayes, of Chicago (William J. Harte, Philip Rock, and John Gervasi, of counsel), for appellees.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant, Dr. John B. O'Donoghue, appeals from a judgment entered on the verdict against him and other doctor-defendants in a medical malpractice action brought by plaintiff, Deborah Burrow. He contends: (1) plaintiff failed to establish by expert testimony that he deviated from an accepted standard of medical and surgical care and that his actions were the proximate cause of her injury; (2) the trial court improperly refused to allow his counsel to examine a co-defendant immediately following plaintiff's examination of the co-defendant called as an adverse witness; and (3) the damages awarded are excessive.

In July 1969, Deborah Burrow, a 15-year-old diabetic, underwent surgery for a possible appendicitis; she has never regained consciousness and remains in a semi-comatose condition. Deborah and her parents, Darlene Burrow and Norbert Burrow, brought this action against defendants, Dr. Edith Widder, an anesthesiologist; Dr. John B. O'Donoghue, a surgeon; Dr. Edward J. Winter, an internist; and Little Company of Mary Hospital. Special conservators were appointed for Deborah in the proceedings. At the close of evidence a directed verdict was granted in favor of the hospital. The jury returned verdicts holding Doctors Widder, O'Donoghue and Winter jointly liable, and assessing damages in the amount of $1,500,000 in favor of Deborah, and $1,000,000 in favor of her parents. Judgments were entered accordingly.

After each defendant had filed a post-trial motion for judgment notwithstanding the verdict and for new trial, covenants not to execute upon the judgments were entered into by plaintiffs with Dr. Widder under which the latter paid $600,000 to the estate of Deborah and $600,000 to the parents. The trial court subsequently denied the post-trial motions, conditioned as to the parents upon their remittitur of $400,000, to which the parents consented. They accepted the payment from Dr. Widder in

full satisfaction of their judgment. Therefore, the parents' judgment is not before this court.

Thereafter, notices of appeal were filed by Drs. O'Donoghue and Winter. Dr. Winter and Deborah's conservators then entered into a covenant not to execute upon her judgment under which Dr. Winter paid $200,000 and dismissed his appeal. Dr. O'Donoghue appeals from the judgment in favor of Deborah which remains unsatisfied in the amount of $700,000, excluding interest and costs.

The trial of this cause was long and complex, involving a hospital and three of its staff physicians, each practicing within his or her own specialty. Their actions concerning this patient were to an extent inter-related. However, only one of the physicians is before this court, and we are called upon to isolate his activity from that of his colleagues to determine whether the evidence establishes malpractice on his part.

The evidence adduced at trial is voluminous; the testimony is necessarily detailed. What follows immediately is an overview of the treatment given Deborah by all defendants. More detailed testimony concerning the role of Dr. O'Donoghue is set forth in our discussion of the issues.

In 1967, Deborah Burrow, then 13 years old, was diagnosed as a diabetic. During a period of hospitalization at that time she was seen regularly by Dr. Winter, a specialist in internal medicine. After her release from the hospital, she continued to be treated by Dr. Winter's partner, Dr. Vil, also an internist. Deborah learned the technique of self-administering daily injections of insulin, and she also learned to test her urine for sugar and acetone. In other respects she lived a normal life; she achieved good grades in school and participated in physical activities. Her diabetes appeared well controlled.

At about 1 p.m. on July 9, 1969, Deborah and her mother came to the office of Doctors Winter and Vil. She was examined by Dr. Winter. She told him that she had had diarrhea the day before and abdominal pain since that morning. Her abdomen was tender in the right lower quadrant, though Dr. Winter found no rebound tenderness. The turgor of her skin demonstrated that she was dry and dehydrated. She was lethargic. Her sugar was strong and positive, and there was acetone in the urine. Dr. Winter recorded her history and ordered blood tests. The tests showed high hemoglobin and hematocrit readings, and an elevated white blood cell count. On the basis of the history, physical examination and his interpretation of the blood tests, Dr. Winter formed a clinical diagnosis of ketoacidosis (a state of metabolic imbalance) and possible appendicitis. He discussed the matter with Deborah's mother. He recommended hospitalization.

Because of the possibility of appendicitis, Dr. Winter asked Dr. O'Donoghue, who had an office in the same building, to examine Deborah and give his opinion as a surgeon. Dr. O'Donoghue reviewed her history as recorded by Dr. Winter. In addition to the facts contained therein, he noted that she was nauseated; he "understood" that she had vomited prior to coming to the office, although Dr. Winter's record indicated otherwise. Upon physical examination, he found that her abdomen was flat, which he interpreted as indicating distention. He did not test for rebound tenderness. She responded to palpation of the right side below the beltline. Dr. O'Donoghue also formed a diagnosis of possible appendicitis and ketoacidosis.

Deborah was taken to Little Company of Mary Hospital by her mother at about 3 p.m. She was admitted under the care of Dr. Winter. The admitting orders sent by Dr. Winter requested a determination of serum electrolytes, urine analysis and blood tests. The order also directed that she be given insulin subcutaneously and a liter of Ringer's lactate solution intravenously. At about 3:30 p.m. Dr. Winter saw Deborah in the hospital and observed no difference in her appearance.

At about 7 p.m. Dr. O'Donoghue examined Deborah. She again complained of pain in her right lower quadrant. Dr. O'Donoghue re-examined Deborah's abdomen and reviewed an X ray of the area taken on admission. The X ray revealed a collection of gas in the right lower quadrant. The results of the tests ordered by Dr. Winter were available. Dr. O'Donoghue reviewed these and noted a drop in the hematocrit and white blood cell count. The blood chemistries showed that the pH and potassium were below normal. He determined that the patient was not as dehydrated and lethargic as she had been during the examination at Dr. Winter's office. Dr. O'Donoghue conferred with Dr. Winter by telephone and ordered a repeat "sodium, potassium, chloride, $CO_2$ and pH blood sample" be obtained. He also ordered a portable chest X ray. Deborah's parents were at the hospital; he spoke with them about their daughter's condition and informed them that he would return to the hospital later that evening.

Dr. Winter returned to the hospital at about 7:30 p.m. He too reviewed the results of the tests he had ordered, and he also looked over the nurse's notes, all orders, and the patient's history. No progress notes had thus far been prepared. He examined Deborah and found her pulse and respirations rapid. He found that she was improving in regard to dehydration, and that she was controlling her sugar and experiencing diminished pain. He was less alarmed about her general condition, but had no conclusion with respect to the appendicitis. However, in his progress notes he indicated that appendicitis was less likely.

At about 8 p.m. Dr. O'Donoghue received a call from a nurse asking

whether something could be given to relieve Deborah's headache. Dr. O'Donoghue ordered 30 milligrams of Talwin, an analgesic, to be given intramuscularly.

Since her arrival at the hospital, fluids were administered to Deborah intravenously. The first I.V. started at 4:26 p.m. was Ringer's lactate solution containing a small amount of salt. On Dr. Winter's orders it was followed at 6:15 p.m. by Ringer's lactate solution with glucose. The third I.V. started at about 9 p.m. was a simple saline solution with 5% glucose.

At about 10 p.m. Dr. Winter received a call informing him of the results of the tests taken at 9:30 p.m. On the basis of these results, Dr. Winter ordered 40 milliequivalents of potassium chloride to be added to the I.V. started at 9 p.m.

At about 10:30 p.m. Dr. O'Donoghue returned to the hospital. Deborah's history had been taken and she had been examined by a medical student who recorded his findings. Upon physical examination Dr. O'Donoghue found persistence of abdominal extension, localized tenderness in the right lower quadrant, and some guarding on deep palpation. Although she had been given an analgesic at 8:10 p.m., Deborah complained of pain in the right lower quadrant.

Dr. O'Donoghue called Dr. Winter at about 11 p.m. They discussed the laboratory results Dr. Winter had received at 10 p.m. and Dr. O'Donoghue's later findings on physical examination. They decided that the indications were such that the patient had to proceed to surgery, and arrangements were made for an emergency appendectomy. The I.V. which started at 9 p.m., to which 40 milliequivalents of potassium chloride was later added, had almost finished infusing when Deborah was taken to surgery. It was Dr. O'Donoghue's opinion that this potassium would accomplish the necessary metabolic balance.

At about 11:15 p.m., after indirectly communicating with Dr. Widder, Dr. O'Donoghue prescribed atropine as premedication in preparation for surgery. At that time the operating room was being used for emergency surgery on another patient. Dr. Edith Widder was the anesthesiologist for that operation, which was completed at about midnight. The emergency appendectomy on Deborah Burrow followed, with Dr. Widder again serving as the anesthesiologist.

Prior to surgery, Dr. O'Donoghue and Dr. Widder met in the doctors' scrub room and discussed the course of Deborah's illness and her condition at that time. They discussed the types of anesthesia; she suggested a spinal because of its convenience at that time of night when hospital personnel is light; however, they agreed on general anesthesia because they determined it would be traumatic for a person Deborah's age to be awake during surgery. Dr. Widder then examined Deborah's record and noted the diagnosis of diabetic acidosis and appendicitis; she

also reviewed the lab reports. She did not examine the patient prior to surgery.

Dr. Widder began induction at 12:45 a.m. with sodium pentothal. She inserted an oropharyngeal airway and maintained anesthesia with cyclopropane and oxygen. She also administered succinylcholine, a muscle relaxant designed to facilitate surgery. The drug was titrated, and Dr. Widder did not record or recall the amount given during surgery. Dr. Widder assisted respiration by use of a mask and breathing bag, and monitored Deborah's pulse with a precordial stethoscope.

The patient was draped, and the first incision was made at 1:05 a.m. Dr. O'Donoghue was assisted in surgery by Dr. Prabhaker. They were working in a bloodless field. After surgery proceeded for about 20 minutes, Dr. Widder announced that the blood pressure was dropping; then that she could not get a pulse or blood pressure. Dr. O'Donoghue checked the femoral region for a pulse and there was none. After announcing the crisis, Dr. O'Donoghue gave instructions to the personnel in the operating room and commenced external cardiac massage. Dr. Widder removed the mask and the oropharyngeal airway, and inserted an endotracheal tube. Prior to that point in the operation, an endotracheal tube had not been used to ventilate the patient. About one minute and ten seconds after external cardiac massage began, it was interrupted so that Dr. Prabhaker could inject adrenaline by the intracardiac route. Oxygenated blood was observed in the syringe prior to injection. A cardiac monitor was brought into the operating room and connected. About two minutes and ten seconds elapsed from the time the crisis was announced before a normal oscillographic tracing appeared. At that time Dr. Widder confirmed a recordable and low normal pulse and returning blood pressure. Sometime after resuscitation, surgery was completed. The appendix, which Dr. O'Donoghue stated had been removed prior to the crisis, was later determined to be normal.

After surgery Dr. O'Donoghue called Dr. Winter and told him that Deborah had gone into cardiac arrest. Deborah entered the intensive care unit at about 2 a.m., and Dr. Winter ordered that she be placed on a cardiac monitor. He prescribed dilatin to prevent convulsions and digitalis to treat a persistent rapid heartbeat.

On July 11 Deborah was examined by a neurologist. On that date decadron was prescribed to treat swelling of the brain. Dr. Winter testified that swelling of the brain causes additional brain damage. Although Dr. Winter testified that swelling may result from the absence of oxygen in the brain, he did not order decadron until July 11 because he fully expected Deborah to come out of the anesthesia after the operation. He weighed the benefits of decadron against the fact that the patient was post-operative and diabetic, and the possibility of a peptic ulcer resulting from the use of the drug. His assessment of the risk and possible benefits

were based in part upon being told that the patient had been deprived of oxygen for only one minute.

Deborah did not regain consciousness. She remains in a permanent semi-comatose condition, variously described as a state of "akinetic mutism" or a "persistive vegetative" state. The testimony shows that the condition was caused by hypoxia, an insufficient amount of oxygen to the brain. She is bedridden and dependent on others for movement. She can apparently see and hear, but there is no intellectual function nor response to her surroundings. The prognosis for her recovery is nil.

## OPINION

Dr. O'Donoghue argues that he is entitled to a judgment in his favor as a matter of law, since plaintiff failed to present expert testimony to establish that he deviated from the accepted standard of medical and surgical care and that his actions caused injury to Deborah.

■■ The general rules for determining liability in a medical malpractice case are well established. "[P]laintiff, by the use of expert testimony, must establish the standards of care against which the defendant doctor's conduct is measured. The plaintiff must then further prove by affirmative evidence that, judged in the light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff." *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 305.

In a malpractice action the burden is on plaintiff to establish every fact necessary to constitute his cause of action. (*Gault v. Sideman* (1963), 42 Ill. App. 2d 96, 191 N.E.2d 436; *Olander v. Johnson* (1930), 258 Ill. App. 89.) In order to sustain a verdict for plaintiff, the standard of medical practice in the community must be shown by affirmative evidence, and, unless there is evidence of such a standard, a jury may not be permitted to speculate as to what the required standard is. See 70 C.J.S. *Physicians and Surgeons* §62 (1951).

■■ If the plaintiff fails to show that the doctor deviated from the standard of care or that his conduct was a proximate cause of the plaintiff's injury, no case is presented for the consideration of the jury. (*Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill. App. 2d 461, 235 N.E.2d 671; *Wade v. Ravenswood Hospital Association* (1954), 3 Ill. App. 2d 102, 120 N.E.2d 345.) However, judgment will not be entered here for the defendant unless all of the evidence viewed in the aspect most favorable to the plaintiff so overwhelmingly favors the defendant that no contrary verdict based on the evidence could ever stand. *Borowski*.

Plaintiff's allegations of malpractice against Dr. O'Donoghue are as follows:

(1) failure to provide for adequate evaluation of the patient's

state of electrolyte balance within a reasonable time prior to surgery;

(2) consent to abdominal surgery under general anesthesia at a time when the patient was not properly prepared for surgery under general anesthesia, and the surgical indications were not so emergent that surgery could not be delayed; and

(3) failure to require endotracheal intubation for surgery under general anesthesia involving the use of a respiratory depressant agent and muscle relaxant.

We will examine the record as to each of plaintiff's allegations to determine whether in light of *Borowski* plaintiff presented evidence to sustain the verdict.

In support of her allegations, plaintiff presented the testimony of four expert witnesses: Dr. Kessler, Dr. Collins, Dr. Ginsberg, and Dr. Greene. Dr. Kessler is a surgeon; Doctors Collins, Ginsberg and Greene are anesthesiologists. Doctors Widder, O'Donoghue and Winter were called as adverse witnesses in plaintiff's case in chief. The testimony with respect to each of plaintiff's allegations follows.

Plaintiff alleges that she was in a state of acidosis at the time she entered surgery and that her condition contributed to cause the cardiac arrest and affected respiratory control.

Dr. O'Donoghue testified that based on his physical examination of the patient at 10 p.m. the indications were such to proceed to surgery, and it was his opinion that the 40 milliequivalents of potassium chloride added to the 9 p.m. I.V. solution would bring the patient into metabolic balance.

Dr. Winter, co-defendant internist, testified that a patient in metabolic acidosis is both a surgical and an anesthetic risk. Dr. Widder, co-defendant anesthesiologist, testified that the previous physical status of the patient, the fact that she had been in a state of ketoacidosis, contributed to the weakening of the heart, and this sudden change in her condition caused the cardiac arrest.

Dr. Greene, an anesthesiologist, testified that Deborah's state of electrolyte imbalance was a competent contributing factor to the cardiac arrest. He stated:

"[S]he was not a poor risk for surgery. She was not a poor risk with the exception to one type of exposure, and that was to the anesthetic drugs and the anesthetic technique. Other than that, Deborah Burrow was not a risk either from an internist's point of view as to her ability to survive that episode of admission to the hospital, and she was no poor risk with reference to having an appendectomy done in the hands of Dr. O'Donoghue."

Dr. Collins, an anesthesiologist, testified that the only cause of patient's cardiac arrest was hypoxia.

Dr. Kessler testified as a specialist in surgery. A considerable amount of his testimony related to Deborah's electrolyte balance. In particular, this testimony concerned the level of potassium and the preparation of the patient for surgery. Dr. Kessler had criticisms to offer about several aspects of the evaluation of Deborah's potassium level. He testified:

"I think to try to treat this patient's diabetic ketoacidosis without a Folin catheter and hourly urine output is grossly inadequate. I think the failure to monitor the potassium on several different occasions before proceeding with surgery is grossly inadequate. * * *. I find that to allow a patient with diabetic ketoacidosis and a falling potassium to go into an operating room without even getting an electrocardiogram grossly inadequate. * * *."

Although the propriety of the evaluation of the electrolyte balance prior to surgery was submitted to the jury as a separate issue, that issue can only have relevance when considered in the light of the decision to proceed to surgery. In this regard, on examination by counsel for Dr. O'Donoghue, Dr. Kessler testified as follows:

"Q So when the surgeon gets down to that moment of truth, when he must decide, he relies—he really has to rely first and foremost on the feel of the abdomen, the localization of the pain, and the history of the patient, is that correct?

A That is correct.

Q In this hypothetical case, do you have any real quarrel with the decision to do surgery?

A No.

* * *

Q [A surgeon is] never positive before he operates whether there is appendicitis, is he?

A Never positive.

Q Doctor, a doctor ought not to be correct more than 85 or 90 percent of the time in his diagnosis of appendicitis?

A That is correct.

Q Because if he's correct more than that, he's missing some, isn't he?

A Yes.

Q And subjecting some patients to the risk of rupture?

A That is correct."

On examination by counsel for Dr. Winter, Dr. Kessler testified as follows:

"Q * * * [C]oming back to this 10:00 o'clock period—there was a decision that had to be made.

Are you in agreement with that hypothetical set of facts?

A Yes.

Q The clinician, the man at hand, made the decision. He had a number of factors available to him; potassium level, pH level, and other findings including his own.

Do you have any disagreement that the decision to make [*sic*] surgery was the proper one?

A No, I cannot question whether the surgeon's decision to operate, since I did not have the opportunity of examining this patient, the abdomen—."

Plaintiff, however, questions the timing of the surgery, contending that the surgical indications were not so emergent that surgery could not be delayed.

Dr. Winter testified that at 7:30 p.m. he was less alarmed about Deborah's general condition; appendicitis was less likely, but he had no conclusion in this regard. Upon examination by counsel for plaintiff, Dr. Winter testified concerning the events of 11 p.m. as follows:

"Q How long could [the surgery] have been delayed?

A I don't know. At that point, we were now where we had to make a decision to proceed, or delaying further, and after a prolonged delay getting her acidosis corrected, we then—we were faced with still the dilemna, do we have to go ahead and treat this as an acute appendicitis, or can we delay longer. * * *. At that point, we decided we wouldn't delay much longer, and should proceed with the surgery as expeditiously as practical. * * *. As soon as it could get done.

* * *

Q Doctor, are you saying that regardless of what electrolyte study was done shortly before this child was taken to surgery, you would have gone ahead and done surgery?

A As far as one could anticipate at that time, yes. As far as one could expect. If you say that some change would have occurred, I think I would have to say this would have changed our mind.

There was no reason to anticipate any great change in the findings."

Although Dr. Kessler testified that he had no quarrel with the decision to operate, in his opinion the surgery did not have to proceed at that time. However, he stated that the effect of delay can be exceedingly dangerous; that in delaying surgery to further improve the patient's diabetic status, the surgeon runs the risk of further deterioration of the patient's condition and the presence of an infected appendix may make adequate diabetic control unexpectedly difficult; and that the surgeon must keep in mind that a ruptured appendix is an overwhelming infectious condition which would require immediate surgery regardless of the patient's electrolyte levels. Nonetheless, Dr. Kessler concluded that there was nothing to

indicate that "a little delay" could not have taken place to recheck the electrolytes.

However, Dr. Kessler, the only surgeon to testify for plaintiff as an expert witness, was not asked his opinion of what caused Deborah's brain damage. We find that the evidence fails to establish a causal connection between the evaluation of the potassium level and the crisis which occurred during surgery. (*Ybarra v. Cross* (1974), 22 Ill. App. 3d 638, 317 N.E.2d 621.) Further, there was no testimony that the decision to proceed with surgery was not in accordance with good medical practice.

■■ We are of the opinion that viewed in its aspect most favorable to plaintiff, the evidence does not establish that Dr. O'Donoghue deviated from an accepted medical standard in proceeding to surgery. See *Borowski v. Von Solbrig; Estell v. Barringer* (1972), 3 Ill. App. 3d 455, 278 N.E.2d 424; *Scardina v. Colletti* (1965), 63 Ill. App. 2d 481, 211 N.E.2d 762.

The remaining allegations involve the selection of the type of anesthetic, the anesthetic agents and the decision whether to use an endotracheal tube.

Dr. O'Donoghue testified that until the crisis occurred during surgery, he was not aware that the patient had not been intubated by means of an endotracheal tube. At the time the crisis was announced, he found that Deborah was receiving anesthesia through a mask and that she had a cyanotic or bluish color signifying a lack of oxygenated blood. At that point Dr. Widder removed the mask and oropharyngeal airway, and inserted an endotracheal tube.

Dr. Collins, an anesthesiologist called by plaintiff, testified that in his opinion Deborah suffered brain damage from hypoxia, an insufficient supply of oxygen to the brain. He stated that hypoxia was the only cause of her cardiac-circulatory arrest, and that hypoxia was "due to inadequate ventilation, inadequate airway." He testified: "[From] what you have told me about the conduct of the anesthesia, I would say that this patient, without a doubt, was obstructed." He further testified that since the patient was cyanotic at the time the cardiac arrest occurred, she had not been receiving adequate oxygen for five to ten minutes prior to the crisis.

Dr. Collins further stated that the responsibilities of the anesthesiologist include: the method of giving anesthesia; the choice of inducing and maintaining agents; the use or non-use of a relaxant drug; whether or not to use an endotracheal tube; and whether or not to use a cardiac monitor.

Dr. Ginsberg, an anesthesiologist, testified that in his opinion the choice of method of anesthesia administration, the agent of administration, and the decision whether or not to intubate were the responsibilities of the anesthesiologist.

Dr. Greene, an anesthesiologist, testified that based on the observation

of cyanosis by Dr. O'Donoghue, hypoxia was the precipitating factor of Deborah's cardiac arrest. He stated that for some period of time prior to the cardiac arrest, Deborah was not receiving adequate oxygen, but the heart was still pumping.

Dr. Greene also stated his opinion as to deviations from reasonable standards of anesthesia which caused or contributed to cause the condition which led to the cardiac arrest and subsequent condition. Among these were: administration of a muscle paralyzing drug and muscle relaxant with insufficient ventilation; use of a mask instead of an endotracheal tube; and administration of gasses under positive pressure without a tube, resulting in aspiration and irritation of the lungs.

The testimony of the anesthesiologists called by plaintiff as expert witnesses was unanimous that the choice of whether or not to use an endotracheal tube is the responsibility of the anesthesiologist. The question here is whether according to an accepted medical standard, the surgeon in the instant case should have required endotracheal anesthesiology for this patient.

Dr. Kessler, a surgeon called by plaintiff as an expert witness, testified as follows:

> "Now, it is also the surgeon's duty to request or see to it that the patient is going to be given the appropriate type of anesthetic. He may not decide specifically the agent to be used, but in 1969, there were very few surgeons who would not make a fuss about the failure to provide endotracheal anesthesia in a diabetic 15-year old who is in electrolyte imbalance."

■■ We find that Dr. Kessler's statement that "there were very few surgeons who would not make a fuss * * *" is insufficient to establish the standard of care against which a surgeon's conduct may be measured in a malpractice case. The plaintiff must provide affirmative proof of the standard of care. (See *Borowski v. Von Solbrig; Lundahl v. Rockford Memorial Hospital Association; Wade v. Ravenswood Hospital Association*.) A jury may not speculate as to what that required standard is. Accordingly we find that plaintiff failed to introduce proof to establish this essential element of the case against Dr. O'Donoghue.

A further note is required regarding the statement by Dr. O'Donoghue that the treatment given Deborah was a team effort. He testified that the management of a diabetic in metabolic acidosis, who is suspected of having appendicitis, is a team effort, that team consisting of the internist, the surgeon and the anesthesiologist; further, that evaluating the patient as an anesthetic risk is also a team effort and that "all of us were involved."

In no way do the responsibilities of these three physicians toward the patient establish a relationship among them wherein the surgeon may be compared to a "captain of a ship." According to that theory, an operating

surgeon may be held liable for the negligence of an assistant employed by a hospital who is under the direct control or supervision of the surgeon. The Illinois rule in this regard is discussed in *Foster v. Englewood Hospital Association* (1974), 19 Ill. App. 3d 1055, 313 N.E.2d 255.

■■ The medical team in the instant case, to which Dr. O'Donoghue referred, consists of three professionals joining together for a common purpose. Each has his or her own area of expertise; each has had different experience and training. With regard to this patient their activity was interrelated, but there was a division of responsibility according to their respective professions. Accordingly, Dr. O'Donoghue, a surgeon, should not be responsible for the judgments of a qualified internist or anesthesiologist within the area of his or her specialty.

■■ We find that the evidence offered by plaintiff fails to demonstrate that Dr. O'Donoghue was guilty of any breach of the standards of his profession. There was no evidence on which the jury could properly render a verdict against him. Accordingly, the trial court erred in denying his post-trial motion for judgment notwithstanding the verdict.

For the reasons stated, the judgment in favor of Deborah against Dr. O'Donoghue is reversed.

Judgment reversed.

LORENZ and WILSON, JJ., concur.