(No. 46316.—

FRANK BOROWSKI, Appellant, v. CHARLES R. VON
SOLBRIG *et al.*, Appellees.

*Opinion filed March 24, 1975.—Rehearing denied May 29, 1975.*

Posner & Posner, and Herman & Tanenbaum, both of Chicago (Fred Posner, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago, for appellees.

MR. JUSTICE RYAN delivered the opinion of the court:

This is a medical malpractice case. The plaintiff, Frank Borowski, was injured in an automobile accident. He brought this action in the circuit court of Cook County against Dr. Charles R. Von Solbrig and the Von Solbrig Memorial Hospital. He alleges that the negligence of the defendants in treating his injuries was a proximate cause of the amputation of his left leg. The jury returned a verdict of $200,000. Prior to trial the plaintiff had settled his claim against the driver of the automobile for $30,000 and executed a covenant not to sue. In entering judgment against the defendants, the trial court reduced the amount of the verdict by the amount received from the driver of the automobile and entered judgment for the plaintiff in the amount of $170,000. The defendants appealed from the judgment, and the plaintiff cross-appealed, asking for a judgment against the defendants in the full amount of the verdict, $200,000. The appellate court reversed and remanded the cause for a new trial. However, it also held that if the plaintiff had received a verdict against the defendants under proper instructions to the jury, the cause of action against the defendants and the cause of action against the automobile driver being separate and distinct, it

would have been improper to reduce the verdict by the amount recovered from the original tortfeasor. (14 Ill. App. 3d 672.) We granted leave to appeal. The bases of the appellate court's reversal and remandment for a new trial were erroneous jury instructions and defects in the plaintiff's hypothetical questions. We affirm the appellate court's order reversing the judgment and remanding the cause for a new trial.

On July 14, 1964, at about 7 a.m., an automobile traveling 25 miles per hour struck the plaintiff as he was walking across a street. He received severe injuries not only to his left leg, which was subsequently amputated, which loss is the basis of the cause of action in this case, but also to his face and right leg. Plaintiff was taken by ambulance to the defendant hospital. It is not disputed that as a result of the accident he received comminuted-type fractures of the nasal bones and that the bridge of his nose was broken and depressed. He had a laceration on his nose and was bleeding from his nostrils when he entered the hospital. He also received crushing injuries to the muscles of the left leg below the knee, compound and comminuted fractures of the left tibia with bony fragments protruding through the skin, a compound and comminuted fracture of the head of the left tibia, a compound and comminuted fracture of the right tibia, and a fracture of the head of the right fibula.

The defendant doctor testified that when he examined the plaintiff in the emergency room he also found but did not record in the hospital records that the plaintiff was shaking, cold, clammy and staring into space; that he had extreme pallor and was unconscious at times and did not answer questions; that the pupils of his eyes were dilated. He further testified that on the basis of these findings he diagnosed but did not record that the plaintiff was in a severe state of shock and had sustained a brain concussion with possible brain damage and that there was a possibility of a basal skull fracture. He also testified that he diagnosed vascular damage to the left leg below the bifurcation of the

popliteal artery into the posterior tibial and peroneal arteries.

X rays were taken of the plaintiff, and he was then taken to his room. Surgery was scheduled for 10:50 a.m.; however it was cancelled because, the defendant testified, he thought the plaintiff was a poor surgical risk at the time because of shock. Besides the other symptoms of shock previously observed, the plaintiff's blood pressure had dropped to 80/60. No treatment for shock was administered. The doctor testified that he permitted the patient to "self-stabilize." Plaintiff's condition improved, and surgery was performed at 4:20 p.m. that day. During the surgery the injury to the muscle was repaired and the wound in the left leg was explored for vascular impairment. The defendant doctor testified that three to four inches of the posterior tibial artery had been obliterated. He did not attempt any repair of the artery because it had no chance of success and he thought further surgery would endanger the life of the patient. An intermedullary rod was inserted in the left leg. Following reduction of the fractures, full leg casts were applied to both legs.

After the plaintiff was returned to his room he complained that the leg cast on the left leg was too tight. The next day, July 15, the left leg cast was split down to the knee and on the morning of July 16, it was removed completely and replaced with an aluminum splint. On the evening of July 16 the plaintiff's wife made arrangements to have him transferred to another hospital.

Late that night or early in the morning of July 17, plaintiff was transferred to Garfield Park Hospital where he was treated by Dr. Benages, who was the plaintiff's family doctor. On that morning both Dr. Benages and Dr. Murphy, an orthopedic surgeon, diagnosed gangrene in the lower left leg. Amputation below the left knee followed on July 18. The first amputation failed to arrest the spreading gangrene, and on August 12 a second amputation above the knee was performed. The allegations of malpractice in this

case relate solely to the left leg.

The plaintiff's doctors stated that in their opinions it was possible to repair the obliterated artery and to establish circulation; that the delay in the surgery, the failure to perform certain tests and the surgical procedures used were not in accord with accepted standards of medical care in Chicago in 1964. The opinion was also expressed that the plaintiff's leg was gangrenous before he left the defendant hospital.

The defendants contend that judgments should be entered in their favor as a matter of law because there was insufficient evidence to support the verdict in favor of the plaintiff. We do not agree. The record contains sufficient evidence of the doctor's negligence and that this negligence was a proximate cause of the plaintiff's injury to submit the question to the jury.

Except in certain limited situations not pertinent here, the appellate decisions of this State have held that the plaintiff, by the use of expert testimony, must establish the standards of care against which the defendant doctor's conduct is measured. The plaintiff must then further prove by affirmative evidence that, judged in light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff. See *Scardina v. Colletti*, 63 Ill. App. 2d 481; *Newman v. Spellberg*, 91 Ill. App. 2d 310; *Sanders v. Frost*, 112 Ill. App. 2d 234; *Estell v. Barringer*, 3 Ill. App. 3d 455; *Ybarra v. Cross*, 22 Ill. App. 3d 638.

As in other negligence cases the question of whether the doctor deviated from the standard of care and whether his conduct was a proximate cause of the plaintiff's injury are questions of fact for the jury. Under the established *Pedrick* criteria, judgment should not here be entered for the defendants unless all of the evidence viewed in the aspect most favorable to the plaintiff so overwhelmingly favors the defendants that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria and*

*Eastern R.R. Co.,* 37 Ill.2d 494.) The opinions of the plaintiff's experts were to a degree weakened on cross-examination and were contradicted by the defendants' witnesses; however, the weight to be given to their testimony was to be determined by the jury. Under these circumstances, judgments for the defendants are inappropriate.

The defendants also contend that they are entitled to judgment because the evidence does not establish that a better result would have been obtained if proper treatment were administered, citing *Moore v. Tremelling* (9th Cir. 1935), 78 F.2d 821. It is unnecessary to extend the burden-of-proof requirements of a medical malpractice case beyond those of an ordinary negligence case by adding the further requirement that the plaintiff prove a better result would have been achieved absent the alleged negligence of the doctor. We have stated above that the plaintiff must prove that the negligence was the proximate cause of his injury. Under accepted instructions this burden must be sustained by proving that the proposition on which he has the burden (proximate cause) is more probably true than not true. (Illinois Pattern Jury Instruction (IPI), Civil No. 21.01.) In *Moore* the court thought that in a malpractice case such as this one the jury should not be permitted to speculate upon the relative amount of injury due to the fracture caused by the original accident and that due to the malpractice. This result can be guarded against by the use of appropriate instructions to the jury. It is not necessary to become involved in all of the collateral ramifications that the "better result" test could inject into a case.

Three doctors testified for the plaintiff. Each was asked a lengthy hypothetical question and, based upon the facts assumed, stated several opinions relating to the standards of medical care which prevailed in Chicago in 1964, whether the defendants' conduct complied with these standards and the proximate cause of the amputa-

tion. The defendants complain of the contents of the hypothetical questions and the manner in which they were asked. We agree that they are highly objectionable. We first consider the length of these questions.

Dr. Benages, the plaintiff's family doctor, in addition to testifying concerning the plaintiff's condition when he was transferred to Garfield Park Hospital was asked a hypothetical question, the portion of which setting forth the assumed facts covered 55 pages of the transcript. This was followed by four pages of objections by defense counsel which were made out of the presence of the jury. The jury was then returned to the courtroom and the defendants continued with their objections. These objections and the rulings of the court covered 45 more pages of transcript. After several of the objections plaintiff's counsel stated "I accept that." If the judge sustained an objection, the plaintiff's counsel stated "withdraw that portion from your consideration." At the end of all of the objections the plaintiff's counsel instructed the doctor to consider the additions and to withdraw from his consideration that portion of the question to which the judge had sustained objections. There then follows 38 pages of transcript which contain questions and opinions based upon the assumed facts.

Dr. Murphy, the orthopedic surgeon who performed the amputations on the left leg, testified for the plaintiff. The hypothetical facts plaintiff's counsel stated to this doctor covered 72 pages of the transcript. The objections and rulings on the objections covered 27 pages. Again from time to time plaintiff's counsel informed the doctor to delete certain facts objected to from his consideration or to consider other matters.

Dr. Woodhouse was the doctor who treated the injuries to plaintiff's right leg after his admission to Garfield Park Hospital. He also testified as an expert witness for the plaintiff. The statement of hypothetical facts to this doctor covered 48 pages of the transcript.

There were four pages of objections made outside the presence of the jury. There were 20 pages of objections and rulings on objections made in the presence of the jury. Again, during the objections made in the presence of the jury, plaintiff's counsel informed the doctor on several occasions to "withdraw that" or "accept that aspect."

We initially criticize the undue length of these questions. Although the record does not reflect the time consumed, it is obvious that in each instance several hours passed between the statement of the assumed facts and the statement by the doctor of his opinion based on these facts. Interspersed between the statement of the facts and the statement of the opinions were the rulings on objections during which the doctor was instructed to "accept that" or "withdraw that from your consideration." Although the doctor may have been able to retain in his mind the facts upon which his opinions were to be based, it is highly unlikely that a juror, not being trained in medicine, would be able to do so.

The use of the hypothetical question is commonly criticized as being susceptible of exploitation by counsel as a means of summarizing and presenting a partisan view of the evidence to the jury during the trial under the guise of interrogating the witness. We conclude that the hypothetical questions in this case afforded plaintiff's counsel three lengthy opportunities for such exploitation. However, we find a more serious exploitation in the material content of each question. A substantial portion of each question, in our best judgment more than one half of each question, does not constitute statements of assumed facts from which an expert can form an opinion. Rather this substantial portion of each question is purely argumentative material designed to persuade the jury, to encourage it to disbelieve the testimony of the defendants' witness, and to prejudice the defendants in the eyes of the jury.

As to prejudicing the defendant, in each of the

hypothetical questions plaintiff's counsel informed the expert (and, incidentally, also the jury) that after plaintiff's wife came to the hospital and saw her husband in the emergency room "she is told by the nurse that she must make financial arrangements to secure her husband's admission to the hospital." This statement is not related in any way to the subject matter of the expert opinion and was only inserted to prejudice the defendant or gain sympathy for the plaintiff.

Another example of these tactics is found in the lengthy statement by counsel that the defendant Solbrig was the founder, builder, medical director, chief of staff and president of the defendant hospital and did most of the hospital hiring and firing; that in addition to the work hours and responsibilities these duties entailed, he maintained two offices for the practice of medicine (giving their locations and office hours). The statement also asserted that the hospital was not an educational hospital and did not employ interns but employed four house doctors who worked on a part-time basis on their days off from other hospitals which were educational hospitals; that one of these four doctors was not accredited by the Educational Council for Foreign Medical Graduates, and "that this very doctor who was not then accredited is shown as having performed medical work on the patient that we are concerned about here." This doctor was never shown to have done anything that did not conform to accepted standards and was not shown to have ever attended the plaintiff. Although counsel asserted he would relate the question of part-time house doctors and the nonaccredited doctor to the issues, he failed to do so and at the close of the case this evidence was stricken. Nonetheless, it remained a part of the assumed facts for whatever it was worth, upon which three experts expressed their opinions. Although it is doubtful if this evidence formed a factual basis for an expert opinion, the plaintiff had the advantage of having argued these facts three times to the jury

through the medium of these hypothetical questions.

An additional prejudicial, erroneous factual statement concerns the failure to immobilize the plaintiff's left leg. The hypothetical question assumes that this leg was never immobilized before surgery, implying the possibility of further vascular injury when it was permitted to dangle and be twisted about as the plaintiff was in his bed awaiting surgery. The hospital records clearly show that when the plaintiff was put in his hospital room at 10:15 a.m. his leg was immobilized. He did not go to surgery until six hours later at 4:20 p.m. Although plaintiff's counsel referred to these records in making his hypothetical statements he neglected to bring that portion of the record reflecting immobilization of the leg to the expert witnesses' attention.

These questions were again used as a vehicle to discredit the defendant doctor by stating as assumed facts: "He does not know the cranial nerves by name, nor does he know them by number, nor does he know them by function." However appropriate such evidence may be for purposes of discrediting the testimony of the doctor as a witness it had no place in the hypothetical question. It was an exploitation of the opportunity afforded by the hypothetical question to argue to the jury three additional times that the doctor was not qualified and that the jury should give no credence to his statement that in treating the plaintiff he had considered the possibility of a basal skull fracture, which possibility he had to consider in determining whether immediate surgery should be performed on the left leg.

Numerous examples of additional attempts to discredit the doctor's testimony are found in the many argumentative references by plaintiff's counsel to the defendant doctor's failure to record certain findings or procedures in the hospital records. It is virtually impossible to set out all such instances, but in summary these references were to the effect that although the doctor said

he found or he observed, he nonetheless did not record it in the hospital records. The appellate court opinion (14 Ill. App. 3d 672, 687-688) refers to several of these statements. However, in addition to the defect of being repetitious as the appellate court observes, we can see no value for such statements as the bases upon which an expert opinion can be formed. We can only view the constant repetition of such statements as an attempt to discredit the doctor's testimony as to his findings and to urge the jury to disbelieve the same because he had not recorded them.

We find a similar attempt to discredit the defendant doctor's testimony as to his emergency-room diagnosis in this statement: "[T]he only comment made in the emergency room record opposite the heading 'Patient's Conditions or other Remarks' is the word 'nervous'. There follows a space in that report of two and a half lines on which nothing else appears." The fact that there were two and a half lines on the form which were not filled in could not have aided the experts in the formation of their opinions. This was pure argument to the jury opposing the doctor's testimony as to his emergency-room findings.

Plaintiff questioned the propriety of delaying the surgery from the scheduled time of 10:50 a.m. until 4:20 p.m. The defendant had stated that the plaintiff's condition at the earlier hour made him a poor surgical risk. The hypothetical questions were used to discredit this testimony by stating as an assumed fact: "The attending physician states that he was available for surgery at all hours during the day. *** Yet he states on two separate occasions before [the time of plaintiff's surgery] he performed two operative procedures." Continuing solely for the purpose of discrediting the doctor's testimony: "Assume further that despite his unrecorded opinion that this man was a poor surgical risk, an opinion which he says he formulated immediately but did not record, and without improvement in his condition, the attending

physician gave this man preoperative medication at 10:15 in the morning and has stated that he would not pre-op a man unless he felt the man was a good or fair surgical risk."

It is impossible in this opinion to list all of the errors similar in nature and magnitude. These examples are sufficient to illustrate that the questions were not used for the accepted purpose of stating assumed facts from which the experts could form an opinion but were used as a means of arguing to the jury on three separate occasions the credibility of the defendant doctor and of discrediting him and the hospital in the eyes of the jury.

The plaintiff contends that the defendants waived any error in the hypothetical questions by failing to specifically object. There is no merit to this argument. We have stated earlier the number of pages of the transcript which were devoted to objections to each hypothetical question. It would have been virtually impossible for defendant's counsel during the reading of the questions to record each specific objectionable feature which they contained. The objections defendants' counsel did record and argue to the court were sufficiently specific to preserve the questions for review. Because of the prejudicial content of the three hypothetical questions, we are compelled to reverse and remand the cause to the circuit court of Cook County for a new trial.

The defendants have also questioned the propriety of the giving of plaintiff's instruction No. 8 which defined proximate cause. The instruction as given states:

> "When I use the expression 'proximate cause', I mean that cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

This is Illinois Pattern Jury Instruction (IPI), Civil No. 15.01. The notes on the use of this instruction state:

> "This instruction in its entirety should be used only when there is evidence of a concurring or contributing cause to the injury or death \*\*\*. In cases where there is no evidence of a concurring or contributing cause, the short version without the bracketed material should be used."

The bracketed material referred to in the notes is that portion of plaintiff's instruction No. 8 which states "It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

We have held recently in *Gertz v. Campbell,* 55 Ill.2d 84, in a case similar to the one we now are considering that the driver of the automobile who injures the party and the doctor who subsequently aggravates the injury through malpractice are not joint tortfeasors. The doctor and the automobile driver did not act in concert to bring about the injury complained of in this situation, that is, the amputation of the plaintiff's leg. It was error to give plaintiff's instruction No. 8, and on retrial of this case the appropriate proximate-cause instruction should be given.

The plaintiff's cross-appeal contends that the $30,000 which he received from the automobile driver on the covenant not to sue should not have been set off against the $200,000 verdict against the doctor. We are of the opinion that the appellate court correctly considered this question when, although not deciding the precise issue, it stated:

> "Since we have determined that the cause of action against the doctor and the cause of action against the auto driver are separate and distinct causes, each resting on its own elements of causation, if plaintiff had received a verdict against the doctor by using proper instructions, it would then have been improper to reduce that verdict by the amount received from the original tortfeasor. The plaintiff would have received two

recoveries for two separate causes of action, and the reduction of one by the amount received from the successful conclusion of the other could not be sustained on any logical theory. Plaintiff would not have been compensated twice for the same injury because the recoveries would have represented compensation for two separate injuries." 14 Ill. App. 3d 672, 690.

This cause of action arose more than 10 years ago, and the parties have endured prolonged litigation which has not been determinative of the issues. Upon remand we urge the court to expedite the trial of the case so that the rights of the litigants may be finally concluded.

The judgment of the appellate court is affirmed, and the cause is remanded to the circuit court of Cook County for a new trial to be conducted consistent with the opinions expressed herein.

*Affirmed and remanded, with directions.*