JUNE CRAWFORD, Plaintiff-Appellee and Appellant, *v.* DR. L. D. ANAGNOSTOPOULOS, M.D., Defendant-Appellant and Appellee.

First District (2nd Division)    No. 78-323

Opinion filed March 27, 1979.

Wildman, Harrold, Allen & Dixon, of Chicago (Maurice J. Garvey, Miles J. Zaremski, and Kay L. Schichtel, of counsel), for appellant Dr. L. D. Anagnostopoulos, M.D.

Wisch and Dyer, of Chicago (Dinah B. Dyer, of counsel), for appellee June Crawford.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Plaintiff June Crawford brought a medical malpractice action against Dr. Irvin H. Strub and Dr. Lampis D. Anagnostopoulos in the circuit court of Cook County. Dr. Strub was dismissed as a defendant before trial, and plaintiff's motion to rejoin him as a defendant was denied. Following a bench trial, judgment was entered in favor of defendant Anagnostopoulos on the issue of informed consent but against him on the malpractice issue. Plaintiff was awarded a $6,000 verdict.

Defendant appeals that portion of the order finding him guilty of malpractice and contends that plaintiff failed to establish by expert testimony that he deviated from an accepted standard of medical care in his post-catheterization treatment of plaintiff. Plaintiff cross-appeals on

the issue of damages only, contending they were inadequate as a matter of law.

In her amended complaint, plaintiff alleged defendant failed to exercise the degree of care and skill ordinarily possessed by other surgeons, particularly cardiovascular surgeons, in one or more of the following ways: failure to afford suitable post-operative care; failure to follow the advice of a consulting cardiovascular surgeon who recommended a brachial thrombectomy; failure to follow the advice of a consulting physician who advised a stellate ganglion block; failure to recommend an angiogram to determine the cause of plaintiff's symptomatology; failure to entrust plaintiff to the care of a physician skilled in surgical cardiology while defendant was on vacation; failure to diagnose an occlusion in plaintiff's right brachial artery which precluded tests ordinarily performed to determine the existence of a right brachial artery occlusion; and after being advised in writing on September 1, 1973, that plaintiff had a lack of blood supply to her lower right arm and hand, failure to insure that plaintiff received sufficient treatment to bring her condition to a successful conclusion.

The record indicates that in June 1973, plaintiff, while undergoing X rays, experienced chest pains and was hospitalized at the direction of Dr. Irvin Strub. Dr. Strub, an internist with a subspecialty in gastro-enterology, testified that he was plaintiff's attending physician. In evaluating plaintiff's symptoms, Dr. Strub suspected heart disease and recommended that a cardiac catheterization be performed. Dr. Strub testified that he did not perform catheterizations and recommended to plaintiff several cardiologists at the hospital who did perform that procedure. Plaintiff, a hospital employee from 1969 to 1974, chose the defendant, a board certified internist and cardiologist. Dr. Strub testified that he consulted with defendant who advised that a catheterization be performed.

On July 2, 1973, defendant performed the cardiac catheterization on plaintiff. An incision was made in plaintiff's right arm above the elbow, and a hollow, wirelike, tubular instrument called a catheter was inserted up plaintiff's right brachial artery to her heart. Dye was then injected into the catheter which entered the coronary arteries providing visualization of the arteries and heart chambers. During the catheterization, plaintiff's right brachial artery began to contract spasmodically. Defendant testified that although infrequent, this does occur. As a result, defendant testified the procedure took longer than usual and before closing the brachial artery, he made certain no clot was present.

After the procedure was completed and later that same day, defendant examined the plaintiff and noted that plaintiff's right radial pulse was intermittent, indicative of a spasm. Defendant ordered the

drug, heparin, an anticoagulant to prevent formation of blood clots, be administered to plaintiff. Defendant was notified that the attempted administration of heparin was unsuccessful and defendant prescribed other orders. He also gave plaintiff a sedative and ordered hot packs for her arm.

The next day, July 3, 1973, defendant examined plaintiff's arm. He noted the right radial pulse was weaker than the left pulse and plaintiff's right hand was slightly cooler than her left hand. Defendant ordered continuous warm soaks for the right arm.

On July 4, 1973, defendant again examined plaintiff's arm and noted the right radial pulse was good. He discussed plaintiff's condition with Dr. Strub and both agreed to discharge her on that day.

Plaintiff was to return on July 9, 1973, so that defendant could take out her stitches. However, before that date, on July 7, 1973, plaintiff went to see defendant complaining of pain in her arm above the site of the incision and difficulty in extending her arm. Defendant examined the arm and found the right arm somewhat cooler than the left and the right pulse weaker than the left. Defendant testified that he told plaintiff there was still a spasm in the brachial artery. He extended her arm, prescribed aspirin for the pain, certain finger exercises, and told her to continue with the warm soaks.

On July 9, 1973, plaintiff was examined by Dr. Strub and told him of the pain, coolness, and trouble extending her arm. He told her to see the defendant. Plaintiff went to defendant's office that same day for removal of the stitches. Plaintiff testified that she was in pain, her fingers were stiff, her arm was cold, and she could hardly move it. She stated that defendant took out the stitches, tried to extend her arm, took her pulse, and told her to take aspirin for the pain and continue with the exercises. Plaintiff testified that defendant told her the pain would go away and she was to contact him if her problems persisted.

Defendant talked with Dr. Strub about plaintiff's symptoms and they agreed that plaintiff should be examined by Dr. Peter Nennhaus, a cardiovascular surgeon. Plaintiff testified that it was the defendant who sent her to Dr. Nennhaus.

Dr. Nennhaus examined plaintiff and recommended that she have a brachial thrombectomy, a procedure to remove a clot from the artery. According to defendant, he advised Drs. Nennhaus and Strub not to perform the procedure. He thought that since plaintiff had a prolonged spasm of the brachial artery, a thrombectomy would only result in additional spasm and could be harmful. Plaintiff testified that she asked defendant his opinion as to Dr. Nennhaus's recommendation, and defendant disagreed and recommended she see Dr. Spiegler, a physiatrist.

Plaintiff saw Dr. Spiegler on July 13 and again on July 16, 1973. Dr. Spiegler concluded that plaintiff had an arterial spasm of the blood vessels in her right arm. Contrary to Nennhaus's findings, Spiegler found plaintiff's artery constricted but not blocked. He recommended plaintiff have a stellate ganglion block. The stellate ganglion is a nerve junction located in one's neck which controls the nerve fibers which go down into arteries of the arm and cause arteries to constrict. Blockage of the stellate ganglion causes the arteries to open up. This procedure could be performed by a physiatrist, an anesthesiologist or a neurosurgeon. Spiegler explained to plaintiff that the risks were slight with little or no potential for serious injury, and that if she did not have it done she might have persistent spasms, increased pain, and impaired circulation to the hand which might become permanent. Plaintiff rejected the recommendation.

On plaintiff's second visit to Spiegler, plaintiff could use her arm more and had less discomfort. Spiegler found less temperature differential between the two hands and a more rapid return of capillary filling after blanching of the fingertips. Spiegler told plaintiff the condition might improve by itself, but he still recommended she undergo a stellate ganglion block. Plaintiff again rejected the recommendation.

Plaintiff was to return on July 19, 1973, so that Dr. Spiegler could examine her arm again. Plaintiff canceled the appointment. A copy of Spiegler's report was sent to Strub who testified that defendant also read the report and they both discussed it. Defendant testified that he told Strub he agreed with Spiegler.

Plaintiff stated that she saw defendant in the hospital and told him what Dr. Spiegler recommended. According to plaintiff, defendant told her the arm would improve and she should not have the block done at that time. Defendant denied this and testified the reason he told plaintiff to see Dr. Spiegler was that he suspected a recurrent spasm of the artery and that a stellate ganglion block should be performed. Defendant said he may have told plaintiff that collateral blood vessels often widen causing more blood flow through the vessels to the lower part of the arm and this clears up the symptoms associated with reduced blood flow. Defendant admitted that he did not recall seeing a condition like plaintiff's in the past. Defendant also testified that he informed plaintiff that he would be on vacation during the month of August. Defendant stated that he left an associate to cover his cardiac patients and that if a complication arose in plaintiff's case, it could not be handled by a cardiologist, and therefore it would be up to Dr. Strub, the attending physician, to handle the matter.

During the months of July and August, plaintiff often saw Dr. Strub in the hospital corridors and they would discuss her condition. In August, plaintiff talked with Dr. Aloco, another cardiologist at the hospital, about

the pain in her arm. She related this to Dr. Strub and also asked his advice about seeing Dr. David Monson, a cardiovascular surgeon recommended to her by a friend.

Plaintiff saw Dr. Monson on August 17, 1973. Monson sent a copy of his report to Strub which stated there was a palpable brachial pulse within three inches of the surgical scar on plaintiff's arm. Monson suggested two possible courses of action: surgical intervention to re-establish flow through the brachial artery or reliance on the development of collateral circulation to establish adequate flow to plaintiff's forearm. Dr. Monson recommended a brachial angiography to visualize the vessel and surgical intervention.

In September, upon defendant's return from vacation, Dr. Strub testified that he showed defendant Dr. Monson's letter and discussed it with him. Defendant told Strub he did not think any further procedures should be done at that time. It was plaintiff's testimony that she saw defendant either in the hospital corridors or in his office in September, October, and November. Each time she said defendant told her the arm would get better in time. She could not remember whether he discussed Monson's letter with her. Defendant denied seeing plaintiff anytime after he returned from vacation.

Dr. Strub testified that on September 24, 1973, he discussed Monson's report with the plaintiff and advised plaintiff to choose one doctor and stay with him. He also advised her that her arm could get better without surgery. Plaintiff testified that on that day Strub had her talk with a visitor at the hospital who had similar problems after a cardiac catheterization. This visitor told plaintiff that her problems did go away in time.

In December of 1973, plaintiff fell and injured her finger. At that time Strub was listed as her attending physician. In April 1974, surgery was performed to straighten out her finger; nothing was done to her arm.

Thereafter plaintiff saw Dr. Monson about her arm. Dr. Monson's associate, Dr. Milton Weinberg, Jr., a surgeon, testified that in June of 1974, he performed a bypass of the obstructed brachial artery in plaintiff's arm. Plaintiff testified that after this operation she was able to use her arm and had less pain. But in 1975, she said her arm began to get cold again and the pain returned. This condition progressed and in April 1976, she saw Dr. Monson again. Between April 1976 and September 1977, she had three stellate ganglion blocks performed by physicians recommended by Drs. Monson and Weinberg.

This trial commenced in October 1977, shortly after the third block was performed. Plaintiff testified that her arm has never been the same as it was before she underwent the cardiac catheterization.

In ruling that defendant had committed malpractice, the trial court found plaintiff's pain and suffering from June 1973 to September 1973 was

proximately caused by defendant's breach of duty to advise plaintiff that treatment of her complication was beyond his skill and necessitated treatment by either a cardiovascular surgeon or a physiatrist.

## I.

■■ Defendant seeks reversal of the trial court's judgment on the issue of malpractice on the basis that plaintiff failed to present expert testimony to establish that he deviated from an accepted standard of medical and surgical care, and that his actions caused injury to the plaintiff. This court will not disturb the trial court's judgment in a bench trial and substitute its own opinion unless the trial court's holding is against the manifest weight of the evidence. (*Spankroy v. Alesky* (1st Dist. 1977), 45 Ill. App. 3d 432, 439-40, 359 N.E.2d 1078.) We find that to be the case here.

■■■ Both plaintiff and defendant, relying on *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301, agree that in order to prove a medical malpractice case:

> "[P]laintiff, by the use of expert testimony, must establish the standards of care against which the defendant doctor's conduct is measured. The plaintiff must then further prove by affirmative evidence that, judged in light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff." (60 Ill. 2d 418, 423.)

If plaintiff fails to prove any one of these elements, plaintiff's burden has not been met. (*Burrow v. Widder* (1st Dist. 1977), 52 Ill. App. 3d 1017, 1023, 368 N.E.2d 443.) Proof by plaintiff that defendant's treatment was not favorable, that she still suffers from the same condition, does not of itself indicate that defendant failed to use the acceptable standard of care. Proof of a bad result or mishap is not evidence of lack of skill or negligence. *Scardina v. Colletti* (1st Dist. 1965), 63 Ill. App. 2d 481, 488, 211 N.E.2d 762.

■■ Generally, plaintiff must present proof by means of expert testimony. Exceptions to this rule have been made in cases where lack of skill or care of the physician is so grossly apparent or the treatment is such a common occurrence as to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279.) Plaintiff in the instant case does not allege negligence in defendant's performance of the catheterization procedure, but rather alleges defendant was negligent in his post-catheterization care. Where, as here, the case concerns complications arising from the highly specialized art of performing a cardiac catheterization, the court is dependent on the testimony of medical experts to establish the standard of care against which the

defendant's conduct must be measured. Failure to establish this standard of care is fatal to a finding of malpractice. *Walski v. Tiesenga*, at 262.

The trial court found that defendant had a duty to actually tell the plaintiff he could no longer advise her as to further treatment since he did not possess the necessary expertise as to her particular complication arising after he performed the catheterization. The question we must resolve is whether there was sufficient evidence in the record to establish this standard and support the trial court's decision. In order to resolve this issue, we must review the testimony of the physicians in this regard.

Dr. David Goldfinger, chairman of medicine at Thorek Hospital Medical Center and head of the department of cardiology, called by plaintiff as her expert witness, testified that once a physician refers a patient for a cardiac catheterization and the cardiologist performs the catheterization, he assumes responsibility for that patient until he brings the case to a successful conclusion. He would be responsible for complications arising from the procedure. "Bringing the case to a successful conclusion" was not defined by Dr. Goldfinger, its meaning was left to speculation, and was not an adequate standard by which to judge the defendant's conduct. (*Burrow v. Widder* (1st Dist. 1977), 52 Ill. App. 3d 1017, 1028, 368 N.E.2d 443.) We note that on cross-examination, Dr. Goldfinger stated that he had never performed a cardiac catheterization, was not board certified in cardiology, and had never treated a patient who had problems arising directly from a cardiac catheterization.

Defendant, called by the plaintiff as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60), testified that he was a consulting physician and was not the plaintiff's attending physician. He stated that the attending physician has the ultimate responsibility for the patient and can accept or reject recommendations from consulting doctors.

Dr. Strub, called as plaintiff's witness, testified that he was plaintiff's attending physician, which he defined as meaning her primary physician responsible for her overall care. He stated that a consulting physician's responsibility is to make suggestions to the attending physician and aid in the patient's care. Strub testified that the defendant, by performing the catheterization, became responsible for the treatment of plaintiff's arm and had a duty to advise the attending physician what should or should not be done.

Milton Weinberg, board certified in general surgery and testifying as plaintiff's witness, stated that a cardiac catheterization is a surgical procedure and like any other surgical procedure has complications. Those complications, Weinberg said, are the responsibility of the person who performed the procedure. Weinberg testified that if vascular

complications from a cardiac catheterization are suspected by the cardiologist, the standard of care is for the cardiologist to refer the patient to a cardiovascular surgeon or a physiatrist since a cardiologist is not qualified to perform the necessary procedures himself.

Defendant's expert, James V. Talano, board certified in internal medicine and cardiovascular disease, testified that a cardiologist has a duty and responsibility to assess problems as they occur, to examine the patient and make a diagnosis as to what the complication is at that time, and decide on a plan of treatment, whether that treatment be direct or indirect. He said that referring a patient to a specialist was a form of indirect treatment. Talano also stated that once a patient is referred to a specialist who is qualified to treat the problem, the responsibility of the referring physician is terminated and it is not necessary that he tell the patient so.

From this evidence it would seem that defendant had a duty to refer plaintiff to a cardiovascular surgeon or physiatrist when he diagnosed a vascular problem and to make certain recommendations to the attending physician. The record clearly indicates, by plaintiff's own testimony, that defendant did refer her to both a cardiovascular surgeon, Dr. Nennhaus, and a physiatrist, Dr. Spiegler. The record also indicates that defendant discussed the recommendations from these doctors and Dr. Monson's report with Dr. Strub, the attending physician. There was no expert testimony as to what defendant should have, or should not have, advised plaintiff in regard to these recommendations. Defendant's referral of plaintiff to other specialists more qualified to treat her condition was an indication of an attempt to seek other advice and a recognition that defendant could not treat her condition. Defendant's failure to actually tell plaintiff she could no longer come to him for advice when defendant had knowledge that plaintiff had a problem beyond his competence to treat is not supported by the record. We also note that plaintiff was a hospital employee familiar with the doctors there and assumedly their specialties. This was not a situation where plaintiff relied solely on defendant's advice, but rather she sought the advice of many other doctors as well. After seeking this advice she would discuss it with her attending physician, Dr. Strub, who in fact instructed plaintiff to choose one doctor and stay with him.

Further, the record does not support a finding that defendant's action or inaction caused plaintiff's injury. Plaintiff argues that between July 2, 1973, and July 4, 1973, plaintiff had an intermittent pulse which indicated a vascular problem; that defendant failed to diagnose this until July 7, 1973; that after plaintiff was referred to Drs. Nennhaus and Spiegler, defendant either failed to advise plaintiff as to the doctors' recommendations or improperly advised plaintiff not to follow those

recommendations; and that he failed to discuss Dr. Monson's report with plaintiff after his return from vacation in September. We find no expert testimony to the effect that the timing of defendant's referrals was a deviation from an accepted medical standard.

Dr. Goldfinger testified that if a patient had a diminished pulse following a catheterization and if the cardiologist felt no immediate care was necessary, then referral to a physiatrist within 10 days and to a vascular surgeon within 30 days would be within acceptable standards of medical care.

The plaintiff questioned Dr. Weinberg about a "fresh clot," the necessity of removing it within 48 hours, and the consequences if it were not removed. However, there is no proof in the record that plaintiff had a clot in her artery immediately following the catheterization. Dr. Weinberg testified that if within 24 hours the pulse was palpable, as it was here, then he might take corrective measures, but that is a judgment call on the part of the physician. If within 72 hours the pulse was good, as in this case, he stated that there was probably no need to do anything, but that this again was a judgment call.

Dr. Talano testified that although a cardiologist cannot perform a thrombectomy, he is still capable of deciding whether one is necessary. He testified that a variation in the pulse could result from a thrombosis of the arterial site, from spasm of the brachial artery or from dissection of the vessel itself. Based upon the notes he reviewed in this case, he could not say with certainty which of these alternatives was causing the variation in plaintiff's pulse. In his opinion, no immediate surgical intervention was necessary. He stated that defendant's advice to the plaintiff after her discharge was within medical and surgical standards. He also stated that after defendant referred the plaintiff to the specialists, the attending physician was then responsible for further treatment.

In the instant case, the record contains no evidence establishing the standard of care upon which the trial court relied in rendering its decision, nor a deviation from an accepted medical standard by the defendant. Therefore, the judgment of the trial court must be reversed. Our decision obviates the necessity of deciding plaintiff's cross-appeal as to whether the damages awarded her were inadequate.

Judgment reversed.

PERLIN and HARTMAN, JJ., concur.