**Carl CICERO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 84 C 9748.

United States District Court, N.D. Illinois, E.D.

July 29, 1986.

Michael L. Bolos, Catherine A. Persin, Michael L. Bolos, Ltd., Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty. by Eileen M. Marutzky, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BUA, District Judge.

The above-captioned matter came before the Court for trial on the merits of plain-

tiff's complaint, which alleges personal injury arising out of negligent care and medical malpractice. Plaintiff seeks damages against the United States under 28 U.S.C. § 1346(b). For the reasons stated herein, the Court enters judgment in defendant's favor and against plaintiff.

## I. FACTS

On November 29, 1978, plaintiff underwent a patellectomy, which is the removal of his right kneecap, at the Veterans' Administration (VA) Lakeside Hospital. The patellectomy was a success and plaintiff alleges no medical malpractice relating to that surgery. (Tr. 56.) After the removal of his patella (kneecap), plaintiff remained at the VA Lakeside Hospital for four or five days. Plaintiff's in-hospital care after the patellectomy was appropriate and is no part of the alleged medical malpractice.

At the time of his discharge following the patellectomy, plaintiff visited the Physical Therapy Department where he was taught to walk with crutches. Plaintiff returned to the VA on December 18, 1978, approximately two weeks after the patellectomy. On December 29, 1978, plaintiff returned to the VA approximately four weeks after his surgery. At that time, his extensor lag was 20 degrees. (Tr. 57, 95.) Extensor lag is where a patient attempts to raise his leg straight against gravity and is unable to fully straighten the knee out. It is measured in degrees from full extension or a straight leg, a zero degree extensor lag, with the number of degrees from zero representing the extensor lag. (Tr. 91.)

On his January 8, 1979 visit to the VA, plaintiff's extensor lag was 15 degrees, which represented a 5-degree improvement. His arc of flexion was at 30 degrees. At that time, plaintiff was told to do range of motion exercises (ROM) and quadriceps exercises (quad sets). (Tr. 58–59, 96.) Quadriceps exercises stress the four muscles on the front of the thigh that control the stability of the knee. Raising the leg against gravity is a form of quadriceps exercise. (Tr. 92.) A good form of a quadriceps exercise would be putting cans of food in a purse and lifting it with the leg. (Tr. 93.) Range of motion exercises in-

crease the arc of motion of the knee. (Tr. 93.)

After a patellectomy, the extensor mechanism must heal before starting motion of the knee. Patients are usually immobilized for a period of six weeks. At the end of six weeks, patients can start on range of motion exercises by bending the knee. (Tr. 92.)

Plaintiff continued to perform straight leg lifts at his home at least two or three times a day, after he was released from the VA. (Tr. 18.) Plaintiff was given additional instructions by the VA for at-home exercises. For example, he was instructed to lay flat on the bed, take a purse, put cans in the purse, and use it as a weight for leg lifts. (Tr. 18, 41, 42.) This is a form of at-home physical therapy. (Tr. 41–42, 59, 93.)

Plaintiff returned to the VA on January 22, 1979. His extensor lag measured 10 degrees, which was an additional improvement of 5 degrees. His arc of flexion remained at 30 degrees. As far as physical therapy is concerned, plaintiff's chart states to "Continue Program." (Tr. 59–60, 97.)

Plaintiff returned to the VA on February 6, 1979. His extensor lag measured 5 degrees, which was an additional 5-degree improvement. His arc of flexion measured 40 degrees, which was a 10-degree improvement. Plaintiff was instructed to continue the program. (Tr. 60, 98.)

Plaintiff returned to the VA on March 30, 1979. His arc of flexion was 45 degrees, which was a 5–degree improvement. His medical records include a notation that patient still needs intensive physical therapy. (Tr. 98–99.) On his April 30, 1979 visit, a physical therapy consult was requested. (Tr. 99.) The consult was conducted on June 15, 1979. (Tr. 99.) At that time, plaintiff's extensor lag measured 0 degrees, and his arc of flexion was 40 degrees. Plaintiff started his in-hospital physical therapy on June 20, 1979. (Tr. 99.)

Plaintiff returned to the VA clinic on July 6, 1979. His extensor lag measured 5

degrees and his arc of flexion measured 45 degrees. Plaintiff's arc of flexion on August 13, 1979 measured 60 degrees, which is continued improvement. (Tr. 100.) Plaintiff progressed with the in-hospital therapy until August 27, 1979, when serial casting began. (Tr. 26, 100.) Serial casting is a technique to attempt to improve a knee's arc of motion. Casts are changed sequentially to try to manipulate the knee in more flexion. (Tr. 100.)

Each side presented an expert witness at trial. Plaintiff's expert is Dr. Robert Fink, M.D. Dr. Fink is an orthopedic surgeon who practices at nine different hospitals in Chicago. There was no testimony regarding Dr. Fink's educational background or his medical training after medical school. He is in the process of being a clinical associate teaching the Rush medical students at Mount Sinai Hospital. (Tr. 48.) However, Dr. Fink does not teach in a classroom at any medical school. (Tr. 65.) He is board eligible, but is not yet board certified. (Tr. 49.) He has published three articles, but none in the past four years. (Tr. 65.) Finally, he has never testified as a nontreating expert witness (Tr. 70) and he charges $1,000 per hour for his time as an expert witness. (Tr. 69.)

Defendant's expert is Dr. Steven Gitelis, M.D. Dr. Gitelis is an orthopedic surgeon who became board certified in 1982. (Tr. 87.) He graduated from the University of Illinois in Champaign and subsequently attended Rush Medical College in Chicago. (Tr. 87.) He did a one-year general surgery residency followed by a four-year residency in orthopedic surgery at Rush-Presbyterian-St. Luke's Hospital in Chicago. (Tr. 87.) He then did a one-year fellowship in orthopedic oncology spending six months in Italy at the Rizzoli Institute and six months at the Mayo Clinic. He was elected to be a North American Traveling Fellow which is an honor bestowed on four American orthopedic surgeons who are selected to travel around the United States and Canada visiting teaching programs, lecturing and reviewing those programs. (Tr. 88.)

Dr. Gitelis is an Assistant Professor of Orthopedic Surgery at Rush Medical College. He is employed by Rush-Presby-terian-St. Luke's Hospital, not only as a member of the medical school's teaching staff, but also as the Director of the Section of Orthopedic Oncology. He is an Assistant Attending soon to be Associate Attending Orthopedic Surgeon at Presbyterian-St. Luke's Hospital. (Tr. 89.)

Dr. Gitelis has published 19 papers and presented 37. He has authored one book chapter. (Tr. 89.) He has two current funded research projects. He has testified as an expert witness in the field of orthopedic surgery on five occasions and charges $300 per hour. (Tr. 90.) Finally, Dr. Gitelis has performed approximately 20 patellectomies. (Tr. 90.)

## II. DISCUSSION

The sole issue in this case is whether the plaintiff received proper physical therapy after his surgery on November 29, 1978. Plaintiff contends that he did not receive proper physical therapy early enough in his postoperative treatment. Specifically, he argues that in-hospital physical therapy should have been instituted sooner than when it was actually instituted, seven and one-half months after surgery. Plaintiff concludes that the failure to institute in-hospital physical therapy sooner constitutes a breach of the standard of orthopedic care and therefore was negligent. Finally, plaintiff asserts that this negligence caused a severe limitation in his knee movement, made him unable to return to gainful employment, and therefore caused him damages in the amount of $750,000.

Defendant counters that the institution of at-home physical therapy was the accepted practice in orthopedic postoperative treatment. Defendant asserts that, in this case, at-home physical therapy instituted six weeks after surgery worked well for the following six months, at which time plaintiff required in-hospital physical therapy. Defendant also contends that the condition of plaintiff's knee as well as several surgical procedures performed on the knee prior to this surgery limited his recovery.

In order to prove a medical malpractice case, plaintiff, by the use of expert testimo-

ny, must establish the standards of care against which the defendant doctor's conduct is measured. *Borowski v. Von Solbrig*, 60 Ill.2d 418, 423, 328 N.E.2d 301, 304–305 (1975). The plaintiff must then prove by affirmative evidence that, judged in light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the plaintiff's injury. *Id.* If plaintiff fails to prove any one of these elements, his burden has not been met. *Burrow v. Widder*, 52 Ill.App.3d 1017, 1023, 10 Ill.Dec. 848, 368 N.E.2d 443 (1st Dist.1977). Proof by plaintiff that defendant's treatment was not favorable, that he still suffers from the same condition, does not of itself indicate that defendant failed to use the acceptable standard of care. *Crawford v. Anagnostopoulos*, 69 Ill.App.3d 954, 26 Ill.Dec. 234, 239, 387 N.E.2d 1064, 1069 (1st Dist.1979). Proof of a bad result or mishap is not evidence of lack of skill or negligence. *Id.*

The Court turns its attention to the applicable standard of care. In order to sustain a verdict for the plaintiff, the standard of medical practice in the community must be shown by affirmative evidence, and, unless there is evidence of such a standard, the fact finder may not speculate as to what the required standard is. *Burrow v. Widder, supra*, 10 Ill.Dec. at 852, 368 N.E.2d at 447. Generally, plaintiff must present proof of such a standard by means of expert testimony. *Crawford v. Anagnostopoulos, supra*, 26 Ill.Dec. at 239, 387 N.E.2d at 1069.

In the present case, defendant's expert, Dr. Gitelis, testified that the care given to the plaintiff after his patellectomy did not deviate from the accepted standard of care. (Tr. 94.) He testified that the standard of care in the community did not require that in-hospital physical therapy begin sooner. (Tr. 99–100.) He further testified that, under the accepted standard of care, a determination as to when to institute in-hospital physical therapy must be made according to the individual patient's progress in his at-home physical therapy. (Tr. 99–100.) He concluded that, due to the progress that the plaintiff was making in at-home physical therapy, the in-hospital

physical therapy was instituted at a time in his postoperative care that was within the acceptable standard of care. (Tr. 100.) Finally, Dr. Gitelis said that, if a patient is not progressing in at-home physical therapy, he would recommend in-hospital physical therapy. (Tr. 94.)

Plaintiff's expert, Dr. Fink, testified that the plaintiff did not receive adequate physical therapy. (Tr. 49.) He testified that range of motion exercises are appropriate six weeks following a patellectomy. (Tr. 51.) He further testified that the failure to institute range of motion exercises can lead to adhesions, which is the scarring down of tissues and prevents bending the knee. (Tr. 52.)

After reviewing both experts' testimony, the Court finds that there is no conflict between the experts regarding the standard of care. Both experts agree that range of motion exercises are a necessary part of postoperative care following a patellectomy. (Gitelis, Tr. 96; Fink, Tr. 51.) However, the experts disagree regarding whether the range of motion exercises should be done in at-home physical therapy (Gitelis, Tr. 100) or in-hospital physical therapy (Fink, Tr. 51).

In determining whether the standard of care in the community requires range of motion exercises in at-home as opposed to in-hospital physical therapy, the Court finds that the testimony of defendant's expert, Dr. Gitelis, is more credible than that of plaintiff's expert, Dr. Fink. The Court bases its finding on Dr. Gitelis' more detailed explanation as to when to institute in-hospital physical therapy following a patellectomy. On his direct examination, Dr. Gitelis testified that, if a patient progresses well in at-home physical therapy, he would not institute in-hospital physical therapy until later. (Tr. 99–100.) Dr. Gitelis then reviewed the plaintiff's medical records on the record (Tr. 95–99) in order to show that he progressed well during his at-home physical therapy. (Tr. 100–101.) Dr. Gitelis testified that, if plaintiff had not been doing his range of motion exercises at home, his arc of motion would not have

improved from January through May of 1979. (Tr. 100–101.)

In contrast to Dr. Gitelis' detailed testimony, Dr. Fink's direct examination referred to few facts from plaintiff's medical records and his testimony was general and conclusory. Dr. Fink's conclusion that plaintiff did not receive appropriate physical therapy was cryptic and undetailed:

Q Based upon your review of the chart, Doctor, was Mr. Cicero receiving appropriate levels of physical therapy from the point six weeks after his patellectomy until approximately June of 1979?

A I did not see in the chart any indication of that. (Tr. 51.)

In addition, Dr. Fink did not testify regarding what he would have done differently in plaintiff's postoperative care or what other exercises plaintiff should have been taught. Finally, his testimony is at least confusing and at most contradicts the evidence. First, he admits that range of motion exercises should be instituted six weeks after a patellectomy. (Tr. 51.) Second, he testifies that he saw no indication of range of motion exercises in the plaintiff's chart until June 1979. However, Dr. Gitelis commented on the reports of plaintiff's out-patient visits to the hospital and concluded, without contradiction, that the improvement in the arc of flexion in plaintiff's knee from six weeks after surgery to June 1979 meant that plaintiff was doing range of motion exercises in at-home physical therapy. (Tr. 100–101.) Therefore, since Dr. Fink's testimony also contradicts the evidence in the plaintiff's medical records, his conclusion that range of motion exercises did not commence until June 1979 is not credible.

A final factor favoring the credibility of defendant's expert over plaintiff's expert is their respective experience and credentials. Dr. Gitelis is a medical professor in the field of orthopedics, as well as being a department director at a highly respected teaching hospital. Dr. Fink has achieved none of these positions. More important to an opinion of postoperative care following a patellectomy is the fact that Dr. Gitelis has

performed approximately twenty patellectomies (Tr. 90), while there is no testimony that Dr. Fink has ever performed a patellectomy. Finally, Dr. Gitelis has testified five times as an expert witness in the field of orthopedic surgery and receives $300 per hour (Tr. 90), while Dr. Fink is testifying for the first time as a nontreating expert witness and receives $1,000 per hour. (Tr. 66, 69.)

Therefore, based upon the above finding that defendant's expert is more credible than plaintiff's expert, it follows that the Court accepts Dr. Gitelis' testimony that plaintiff received proper physical therapy following his patellectomy. In other words, the postoperative care administered to plaintiff following his patellectomy did not deviate from the standard of care in the community at the time.

Plaintiff also has failed to prove that, even if his postoperative care deviated from the proper standard of care, the deviation caused plaintiff's injury. Plaintiff has the burden of proving, generally through expert testimony, that defendant's breach of the applicable standard of care is more probably than not the cause of plaintiff's injury. *Newell v. Corres*, 125 Ill. App.3d 1087, 81 Ill.Dec. 283, 286, 466 N.E.2d 1085, 1088 (1st Dist.1984). Proximate cause is not established, however, where the causal connection is "contingent, speculative or merely possible." *Id.* In addition, a defendant can properly offer testimony that more probably than not the injury would have occurred irrespective of the defendant's negligence. *Wise v. St. Mary's Hospital*, 64 Ill.App.3d 587, 21 Ill. Dec. 482, 484, 381 N.E.2d 809, 811 (5th Dist.1978). However, plaintiff does not have to show that a better result would have been achieved absent the malpractice. *Id.*

In the present case, the testimony of plaintiff's expert, Dr. Fink, failed to establish that, more probably than not, the alleged deviation from the applicable standard of care caused plaintiff's injury. Dr. Fink testified that it was "very possible" that plaintiff would not have had to have

the subsequent knee surgery, one year after his patellectomy, if proper physical therapy had been instituted with the plaintiff. (Tr. 53.) Dr. Fink also said that it was hard for him to say that the fact that the plaintiff did not receive proper therapy led to his present restricted knee movement. (Tr. 64.) In addition, Dr. Fink testified that he is unable to say that, had plaintiff received the type of physical therapy that the doctor previously described, plaintiff would not have the problems he has today. (Tr. 64.) Finally, Dr. Fink testified that it is possible that plaintiff would have had a better result. (Tr. 64.)

The testimony of Dr. Gitelis supports the conclusion that the plaintiff has failed to prove causation between the alleged negligence and plaintiff's injury. Dr. Gitelis testified that it is impossible to conclude that, if plaintiff had received in-hospital physical therapy prior to June 20, 1979, his current condition would have been any different. (Tr. 95.) He testified that some patients, even after a formalized physical therapy program following a patellectomy, are unable to achieve a good arc of motion. (Tr. 95.) Finally, Dr. Gitelis testified that the problems which plaintiff suffered were the result of many factors, including arthritis and multiple surgical procedures, and that the lack of in-hospital physical therapy did not contribute to plaintiff's injury. (Tr. 103.)

Therefore, in light of the above testimony of both experts, the Court finds that the plaintiff failed to prove that the alleged deviation from the applicable standard of care caused plaintiff's injury.

### III.  CONCLUSION

For the reasons stated above, the Court finds in favor of the defendant and against the plaintiff. Accordingly, judgment is entered in defendant's favor.

IT IS SO ORDERED.