DIANA HARDEN WILSMAN, Plaintiff-Appellant, v. WITOLD A. SLONIEWICZ, Defendant-Appellee.

Second District   No. 2—87—0878

Opinion filed July 13, 1988.

---

Robert E. Gordon and Lawrence G. Gordon, both of Gordon & Gordon, Ltd., of Chicago, for appellant.

Patricia L. Argentati and Roger K. O'Reilly, both of O'Reilly, Cunningham, Norton & Mancini, of Wheaton, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Diana Harden Wilsman, appeals from a judgment of the circuit court of Kane County granting defendant's motion for a directed verdict. On appeal, Wilsman contends that she met the necessary burden to withstand the motion for a directed verdict. We reverse and remand.

In March 1983, plaintiff filed suit against defendant, Dr. Witold Sloniewicz, and Geneva Community Hospital, alleging that defendant negligently performed a tubal ligation. Plaintiff alleged that following this operation she suffered severe abdominal pain for four years and had damages of $350,000. The hospital was subsequently dismissed by plaintiff, and a jury trial began in the circuit court of Kane County in August 1987.

The plaintiff first called Dr. Sloniewicz as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1102). Defendant testified that when he admitted Wilsman to the hospital to perform the tubal ligation she was complaining of severe headaches and pain in her abdomen. The procedure defendant used to perform the tubal ligation was removal of a section of the fallopian tube and placement of hemoclips on the tube to close the opening. This procedure was repeated for the fallopian tube on the other side of the uterus. After the operation, the defend-

ant saw Wilsman on June 20 and 27, 1977, to remove her sutures. Wilsman had no complaints at that time, and Dr. Sloniewicz did not treat her again. After the June 27, 1977, visit, Wilsman's outstanding bills owed to the defendant totaled $215. Dr. Sloniewicz testified that if a patient had an outstanding bill, he would only see such a patient on an emergency basis unless arrangements were made to pay for the arrearage. Defendant further stated that Wilsman never discussed such an arrangement with him.

The next witness was the plaintiff, Diana Wilsman. Ms. Wilsman testified that she had been suffering abdominal pain for six months prior to visiting the defendant. She asked Dr. Sloniewicz to perform a tubal ligation because she did not want to have any more children. She stated that she continued to have severe abdominal pain and saw Dr. Sloniewicz three or four times in 1978 and again in 1979. Wilsman said the defendant prescribed an antacid for her stomach pains. In 1981, Wilsman had a vaginal hysterectomy, and in 1982, her fallopian tubes and ovaries were removed. After her second operation, she was informed that hemoclips had been used for the tubal ligation. The pains in her stomach continued sporadically until Dr. Zapata removed scar tissue from her stomach. On cross-examination, Wilsman stated that Sloniewicz billed her for visits in 1978 and 1979, but her divorce decree only indicated a debt to the doctor of $215.

Plaintiff then called two doctors to testify on her behalf. The first, Dr. William Matview, testified as an expert witness. Dr. Matview testified that Dr. Sloniewicz deviated from the standard of care in the community by using hemoclips to perform a tubal ligation. He also stated that the clip used by Dr. Sloniewicz was too large. Dr. Matview testified that the placement of the clips could have caused swelling in the fallopian tubes and could cause abdominal pain. Dr. Matview stated on cross-examination that when he gave his deposition, he testified that it was appropriate to use hemoclips for the type of surgery performed on plaintiff. Dr. Mario Zapata testified concerning plaintiff's 1985 surgery and said that the scar tissue he removed could have been caused by previous surgery.

At the close of plaintiff's case, defendant moved the court to strike parts of Dr. Zapata's testimony as being in violation of Supreme Court Rule 220 (107 Ill. 2d R. 220). The court granted this motion. Next defendant moved to strike Dr. Matview's entire testimony in violation of Supreme Court Rule 220; the court denied this motion. Defendant then moved for a directed verdict based on plaintiff's alleged failure to prove causation. During the discussions, the court, on its own initiative, asked plaintiff's counsel if Dr. Matview testified as

to the prevailing community medical standards. The court found that the plaintiff had not offered sufficient evidence as to community standard of care and directed a verdict in favor of defendant.

■ It is axiomatic that directed verdicts should only be entered when all the evidence viewed in a light most favorable to the plaintiff so overwhelmingly favors the defendant that a contrary verdict based on that evidence could never stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) Plaintiff contends that she presented sufficient evidence to survive the motion for a directed verdict. Specifically, she argues that she made out a *prima facie* case with respect to the standard of care.

The applicable standard of care consists of affirmative evidence of what reasonably careful medical practitioners in the community would have done in a similar case. (*Spike v. Sellett* (1981), 102 Ill. App. 3d 270.) The standard must be that which is generally accepted in the medical community. It is not sufficient for plaintiff's expert witness to testify that he would have acted differently in the circumstances or that alternative methods of proceeding existed. *Thome v. Palmer* (1986), 141 Ill. App. 3d 92.

At trial, Dr. Matview, plaintiff's expert witness, testified that he was a physician and surgeon licensed since 1966 in the State of Illinois and is board-certified in obstetrics and gynecology. Dr. Matview has offices in Schaumburg, Elgin, and Crystal Lake. We reasonably infer that Dr. Matview was familiar with the standard of care in the community in which he practices his specialty.

Regarding defendant's care and treatment of plaintiff, Dr. Matview testified as follows:

"Q. Now, Doctor, you had an opportunity to review all of the material that you told us about in regard to this case and the treatment and care that Diana Harden received from Dr. Sloniewicz; have you not?

A. Yes, sir.

Q. And Doctor, did you find whether Dr. Sloniewicz had deviated from the standard of care for medical services in the community on the day that he rendered those services?

A. Yes, sir.

Q. Can you tell us how he deviated?

A. There were two basic areas. One was judgmental and the other was on a technical basis.

Q. Let's take judgmental first. What did Dr. Sloniewicz do wrong judgment-wise?

A. The type of procedure performed on anyone knowledge-

able in the area has an exceedingly high failure rate and is not really one of the bona fide accepted procedures for sterilization at that time."

Dr. Matview then described the procedure used by defendant and stated:

"The problem with that [procedure employed by defendant] is the failure rate with similar type procedures—and this is not one of the known specific accredited procedures—is that failure rate has been recorded as high as one in four with this and so it was, it's not really used by any knowledgeable specialist in the area because the risk factors are so great with this high of failure rate.

Failure rates with other procedures, for instance, the Pomeroy procedure, are approximately one in two hundred fifty."

Plaintiff's expert then discussed accepted procedures utilized by surgeons: Osheta, Irving, and Falope ring. Regarding the clip implanted by defendant, Dr. Matview stated it was termed the Hulka hemoclip. He characterized this hemoclip as similar to a metallic clothespin which blocks the opening of the tube by crushing down upon it. He compared the Hulka to a smaller, plastic type of hemoclip; the latter had a far better success rate than the former but was still much inferior to the other procedures available. Then the following testimony took place:

"Q. So it's my understanding that the use of both clips has a high rate of not working and the rate on the metal clips or the clip that was used here is the worst rate at that time?

A. So much so that it is not really a recognized, the procedure in itself is recognized, obviously, tying the tubes, but that procedure by people knowledgeable in the area is not utilized.

Q. And Doctor, tell us why it is a procedure that deviated from the norm? In other words, why is there such a low success rate when it is used?

A. As I said, the, with just the metal clip [Hulka hemoclip], it acts like a scissors or a shear and crushes through the tube and allows the tube to open proximal to it rather than scar closed, so acts like a cutting scissors, it's like just getting a string and just cutting right through it. You want to use something that will just close it off and let it scar closed.

And the reason, as I say, it's the knowledgeable people in the area don't use it. The risk factors are so great."

Further, Dr. Matview stated that the Hulka hemoclip, because of its large size, necessarily becomes embedded in the tissue surrounding

the fallopian tube. The clip clamps off the normal blood supply to the ovaries. This creates lymphatic congestion which, in turn, causes sensitivity in the tissue and can lead to ovarian dysfunction, pain in the abdomen, menstrual irregularity, and pain with intercourse, the very symptoms that plaintiff complained of.

Dr. Matview additionally stated that one of the two hemoclips placed in the defendant was improperly positioned next to the ovary, where it interfered with the flow of blood to plaintiff's ovaries.

Defendant contends that plaintiff's expert witness' testimony merely established other available alternatives or a difference in professional opinion between defendant and himself. Defendant argues that Dr. Matview failed to set forth the applicable standard of care regarding sterilization in the locale at the time in question.

We do not agree that Dr. Matview simply established other available alternatives or offered a difference in professional opinions. He made it very clear that the defendant's procedure was not used by knowledgeable physicians; this is not merely a dispute over proper methods but a thorough condemnation of defendant's performance. A fair reading of this testimony is that the community standard of care was for a physician to use the other methods of sterilization described by Dr. Matview and not to employ the defendant's method, which had an excessively high failure rate and could lead to serious problems, such as abdominal pain and menstrual irregularity.

The case law cited by defendant is distinguishable from the instant case. In *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, plaintiff's expert testified only in regard to his personal preference for a surgical procedure; the expert did not testify that there was a generally accepted medical standard of care. Here the plaintiff's expert went far beyond stating his personal preference and indeed determined a general standard of care. Of the other cases cited by defendant, *Burrow v. Widder* (1977), 52 Ill. App. 3d 1017, and *Crawford v. Anagnostopoulos* (1979), 69 Ill. App. 3d 954, neither was decided by a directed verdict, and therefore the reviewing court did not apply the *Pedrick* standard to the evidence.

■ In the present case, we find that the evidence regarding plaintiff's establishment of a general standard of care when reviewed in a light most favorable to plaintiff overcame the defendant's contention that a standard had not been established. The trial court erred in directing a verdict in defendant's favor.

Accordingly, we reverse the trial court's decision and remand this case for further proceedings consistent with this opinion.

■ Having so ruled, we will address two issues brought forward

498

by defendant, as these are likely to come up on retrial. First, defendant argues that the applicable statute of limitations (Ill. Rev. Stat. 1985, ch. 110, par. 13—212 (formerly ch. 83, par. 22.1)) was a bar to plaintiff's claim against defendant. Defendant argues that he did not render services to plaintiff after June 27, 1977, while plaintiff argues that she saw defendant until 1981 and that he fraudulently concealed relevant facts from her. (Ill. Rev. Stat. 1985, ch. 110, par. 13—215 (formerly Ill. Rev. Stat. 1979, ch. 83, par. 23).) Defendant asserts that only one conclusion can be drawn from the facts. We do not agree. This is clearly a matter to be decided by the trier of fact upon retrial. *Skoglund v. Blankenship* (1985), 134 Ill. App. 3d 628.

Next, defendant argues that the trial court erred in failing to strike the testimony of plaintiff's expert, or at a minimum, in failing to strike those portions of his testimony relating to and dependent upon materials reviewed and opinions formulated subsequent to his discovery deposition. Because this matter will be retried and further discovery will occur prior to retrial, we do not need to rule on this issue.

Reversed and remanded.

NASH and INGLIS, JJ., concur.