LOUIS CHIERO, Plaintiff-Appellant, *v.* CHICAGO OSTEOPATHIC HOS-PITAL *et al.*, Defendants-Appellees.

First District (4th Division)   Nos. 77-1075, 77-1286 cons.

Opinion filed June 21, 1979.

John G. Phillips, Ltd., of Chicago (John G. Phillips and Michael L. Bolos, of counsel), for appellant.

Maddux, Johnson & Cusack, Ltd., and Wildman, Harrold, Allen & Dixon, both of Chicago (Thomas H. Fegan, Lenard C. Swanson, Miles J. Zaremski, and William D. Serwer, of counsel), for appellees.

Mr. JUSTICE LINN delivered the opinion of the court:

In 1972, plaintiff, Louis Chiero, filed a medical malpractice action in the circuit court of Cook County against the various defendants for personal injuries he allegedly incurred as a result of a surgical procedure performed at Chicago Osteopathic Hospital. In 1976, following extensive pretrial discovery, the trial court granted the defendants' motion for summary judgment.

Plaintiff appeals contending material questions of fact exist which preclude the entry of summary judgment.

We affirm the trial court.

In March 1970, plaintiff was admitted to Chicago Osteopathic Hospital and found to have a congested, obstructed prostate. As he underwent a transurethral resection (TUR) of his prostate gland, plaintiff suffered a cardiac arrest. With the aid of emergency measures, he was successfully revived.

In 1972, plaintiff filed a one-count complaint against the defendants alleging that they were negligent in one or more of the following ways:

"a. Operated on the plaintiff without initially ascertaining that it was safe to do so and without taking adequate pre-operative testing.

b. Administered excessive sedatives, opiates, and/or anesthetic solutions to the plaintiff thereby precipitating or contributing to cause a cardiac arrest.

c. Failed to monitor or otherwise supervise the patient's pulse and other vital signs prior and during the operative procedure.

d. Failed to take adequate preventive steps to prevent the * * * accumulation or injection of an air embolism in the plaintiff's body.

e. Failed to take proper post-operative steps to prevent brain damage after the defendants knew or should have known that a cardiac arrest had taken place.

f. Failed to have a cardiac arrest team, neurosurgeon or other qualified members of the medical staff available or out of the confines of the operating room contrary to the by-laws of the Chicago Osteopathic Hospital and contrary to recognized standards.

g. Failed to have adequate laboratory testing prior to initiating an operation on the plaintiff.

h. Caused an operative procedure to be performed without supplying or having available cardiac monitory devices or without using same during the prosthetic resection.

i. Failed to provide consultations and further failed to discuss the probable complications to the plaintiff with other members of the hospital or medical staff.

j. Initiated an operative procedure on the plaintiff without adequately or sufficiently informing him of the probable complications during such an operation.

k. Failed to consult with the anesthesiologist or provide a properly qualified anesthesiologist prior to sedation."

Plaintiff further alleged that as a proximate result of the above negligence he suffered a cardiac arrest "from which he expired but was thereafter resuscitated with consequent brain * * * damage." Each of the defendants answered the complaint denying any negligence on their part with regard to plaintiff's care and treatment.

From 1972 to 1976, the parties engaged in extensive pretrial discovery. On July 26, 1976, the defendants asked plaintiff to identify each expert witness he intended to call at trial. The request went unanswered. Subsequently, in response to an order by the trial court, plaintiff disclosed that he intended to call at trial Dr. Dennis Streeter as an expert medical witness.

On November 9, 1976, the defendants deposed Dr. Streeter. Dr. Streeter had reviewed the depositions of Dr. Witte and Dr. Buziak, the hospital medical records concerning the care and treatment of the

plaintiff, and interrogatory answers filed by Chicago Osteopathic Hospital and Drs. Lombardo, Szwed, Kovachevic, Caleel, Buziak and Witte.

Dr. Streeter explained that a TUR surgical procedure involves the removal of the fibromuscular portion of the prostate gland by the use of electrocautery. Chips and pieces of the prostate gland are carried into the bladder by an irrigating solution. The chips and pieces and the irrigating solution are then removed from the bladder by an Ellick Evacuator.

During the use of the Ellick Evacuator, many things can be absorbed into the circulatory system, including air. While the human body can handle small amounts of air in the venous circulation with no real difficulty, a large volume of air, such as 50, 75 or 100 cc's, can result in an air embolism. Although Dr. Streeter had never encountered a clinically detectable air embolism in the 100 TURs he had personally performed, an air embolism is a recognized and reported risk of the TUR surgical procedure.

Dr. Streeter asserted that during the TUR surgical procedure performed at Chicago Osteopathic Hospital, a large volume of air entered the right side of plaintiff's circulatory system resulting in an air embolism which eventually caused a cardiac arrest. Plaintiff was resuscitated by proper emergency measures.

Once the underlying factual basis of plaintiff's medical malpractice action was established, the following colloquy ensued at Dr. Streeter's deposition:

"Q. Is it correct, sir, that an air embolism can occur during the performance of a transurethral resection without any negligence on the part of the doctor performing that particular procedure?

A. It can occur as a normal happenstance in action during a T.U.R.

Q. Now, Doctor, you stated that you have formed some opinions regarding the propriety of care rendered by the various physicians to Louis Chiero, is that correct?

A. Yes, sir.

Q. Do you have any criticism of any of the defendant doctors or the hospital as to the care they rendered to Mr. Chiero?

A. No, sir. I really do not. * * *

Q. In your opinion, did any of the doctors that rendered care and treatment to Louis Chiero on or about March 31, 1979, fail to observe the accepted standards of their profession in rendering that care?

A. No, sir. * * *

Q. Now, specifically, Doctor, with my two clients, do you have any criticism whatsoever of Dr. P. R. Lombardo?

A. No, sir, I do not.

Q. Do you have any criticism whatsoever of the care rendered by Dr. Szwed?

A. No, sir.

Q. And specifically, do you have any opinions that Dr. P. R. Lombardo failed to adhere to accepted standard of care in the medical profession as it was practiced in the Chicago area in March of 1970 when he attended to and performed surgery on Louis Chiero?

A. No, sir. I think he used good care and judgment.

Q. And with respect to Dr. Szwed, do you have any opinions that would indicate that Dr. Szwed failed to use accepted care in his treatment of Mr. Louis Chiero on or about March, 1970?

A. No, sir.

Q. Now, Doctor, if I asked you the same question with respect to Dr. George Caleel, would your answer be the same?

A. Yes, sir.

Q. And if I asked you the same question with respect to Dr. Tom Kovachevic, would your answer be the same?

A. Yes.

Q. If I asked you the question with respect to Dr. Chester Buziak, would your answer be the same?

A. Yes, sir.

Q. If I asked you the question with respect to Dr. Henry White, [sic] would your answer be the same?

A. Yes, sir.

Q. Finally, let me ask it this way:

Do you have any opinions based upon your experience and expertise as a physician, your study and research as to whether any of the nursing staff or other employees or personnel connected with Chicago Osteopathic Hospital failed to use reasonable and accepted care as the practice was—as practiced in the Chicago area in March of 1970?

A. I think it was very good care.

 *  *  *

Q. Specifically, sir,  *  *  * in your opinion based upon the evidence you have reviewed, was there professional negligence on any part of the doctors or hospital personnel?

A. No sir."

Shortly after taking Dr. Streeter's deposition, the defendants moved

for summary judgment. The motion was unopposed and the defendants were granted summary judgment on May 2, 1977. On June 1, 1977, plaintiff filed a motion requesting the trial court to reconsider its order granting the defendants summary judgment. Plaintiff's cursory motion to reconsider was not supported by any affidavits, citations to appropriate legal authorities or references to facts developed through discovery. The motion was denied.

Plaintiff appeals.

OPINION

■■ Summary judgment may be granted when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to * * * judgment as a matter of law." (Ill. Rev. Stat. 1977, ch. 110, par. 57; *Stevenson v. Nauton* (April 23, 1979), 71 Ill. App. 3d 831, 390 N.E.2d 53.) The right to summary judgment must be clear and free from doubt. *Donart v. Board of Governors* (1976), 39 Ill. App.3d 484, 349 N.E.2d 486.

We note, initially, that plaintiff's complaint alleges several specific acts of negligence on the part of the defendants. However, as the briefs on appeal implicitly recognize, the propriety of the trial court's grant of summary judgment revolves around the single allegation concerning the air embolism which plaintiff developed during surgery. There is literally nothing in the record to substantiate or support the other allegations of negligence.

Three basic elements must exist in any negligence cause of action: (1) duty; (2) breach; and (3) damage. In the medical malpractice context, duty translates into the standard of care against which the defendant doctor's or hospital's conduct is to be measured. Except in certain limited instances, this standard of care must be established through expert medical testimony. Plaintiff must then prove that, judged in light of that standard, the doctor or hospital was negligent and that their want of skill or care proximately caused plaintiff's injuries. *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *cf. Brainerd v. Kates* (1979), 68 Ill. App. 3d 781, 386 N.E.2d 586 (legal malpractice).

It is undisputed that plaintiff developed an air embolism during a TUR surgical procedure performed at Chicago Osteopathic Hospital. The air embolism caused a cardiac arrest from which plaintiff was successfully revived.

Plaintiff's own medical expert, Dr. Streeter, testified in his deposition that an air embolism is a recognized and reported risk of the TUR surgical procedure. According to Dr. Streeter, an air embolism can occur "as a *normal* happenstance * * * during a TUR." Dr. Streeter also stated that

this particular TUR procedure was performed "as any other TUR is done," and that the conduct of Dr. Lombardo, the surgeon involved, met the prevailing standard of care in the medical community. Dr. Streeter had no criticism of the care and treatment furnished the plaintiff by the defendants, and, in his opinion, there was no professional negligence involved.

## I

In an attempt to both discredit Dr. Streeter's testimony and to create a material question of fact which would preclude the entry of summary judgment, plaintiff contends that the conduct of the defendants in the performance of the TUR surgical procedure was so grossly negligent that a layman could readily appraise it. We disagree.

■■ ■ The development of an air embolism during the transurethral resection of plaintiff's prostate gland "can hardly be placed in the same category as a sponge in the abdomen, an instrument left behind, an X-ray burn or cases of like character which bespeak to the man in the street * * * carelessness on the part of somebody." (*Comte v. O'Neil* (1970), 125 Ill. App. 2d 450, 454, 261 N.E.2d 21, 22.) The common sense of laymen could not be relied upon to provide the requisite standard of care for the performance of the complex TUR surgical procedure involved in this case. *Cf. Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279; *Stevenson v. Nauton* (April 23, 1979), 71 Ill. App. 3d 831, 390 N.E.2d 53; *Crawford v. Anagnostopoulos* (1979), 69 Ill. App. 3d 954, 387 N.E.2d 1064.

In addition to the common knowledge and gross negligence principle, there are other judicially recognized exceptions to the expert testimony requirement. Although plaintiff has raised these exceptions in his brief on appeal, he has failed to demonstrate their applicability to this case.

■ Plaintiff did not present to the trial court any hospital licensing regulations, accreditation standards or bylaws which would support his malpractice cause of action. (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253; see also *Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 303 N.E.2d 392). He did not cite or rely upon any relevant medical treatises which would lend credence to his claim that the defendants were negligent in their performance of the TUR surgical procedure. (See *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 258-59, 381 N.E.2d 279, 293; see generally Annot., 84 A.L.R. 2d 1338 (1962); Fed. R. Evid. 803 (18).) And he did not indicate any basis for, or intention of, utilizing the testimony of the defendants themselves in an attempt to establish a standard of care (*Anderson v. Martzke* (1970), 131 Ill. App. 2d 61, 266 N.E.2d 137; *Comte*

*v. O'Neil* (1970), 125 Ill. App. 2d 450, 261 N.E.2d 21) in contradiction to that testified to by plaintiff's own medical expert, Dr. Streeter. (See *Hill v. Lutheran Hospital* (1978), 58 Ill. App. 3d 1003, 1008, 374 N.E.2d 1147, 1151.) In short, plaintiff's bare claim that the above methods of proof are available to contradict Dr. Streeter's testimony is not a substitute for actual proof. See *Stevenson v. Nauton* (April 23, 1979), 71 Ill. App. 3d 831, 390 N.E.2d 53.

## II

Plaintiff next contends that we should abrogate the requirement, in medical malpractice cases, that the standard of care be established through expert medical testimony. We note initially that this requirement "is broadly recognized throughout the country. [Citations.]" (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 257, 381 N.E.2d 279, 282; Annot., 81 A.L.R. 2d 597 (1962); Annot., 40 A.L.R. 3d 515 (1971).) Nevertheless, plaintiff argues that the expert testimony requirement elevates custom and practice to conclusive evidence of due care, and, thereby, permits the medical profession to set its own standards. We disagree.

Proper standards of practice in any profession, including the medical profession, are not conclusively fixed by local usage or general custom. (See *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253; *Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill. App. 2d 461, 235 N.E.2d 671.) While in most instances, reasonable prudence is in fact common prudence, strictly it is never its measure. *Texas & Pacific Ry. Co. v. Behymer* (1903), 189 U.S. 468, 47 L. Ed. 905, 23 S. Ct. 622; *The T. J. Hooper* (2d Cir. 1932), 60 F.2d 737; see Morris, *Custom and Negligence* 42 Colum. L. Rev. 1147 (1942).

██ In a professional malpractice case, such as here, where expert testimony is required to establish the requisite standard of care, evidence that a defendant's conduct conformed with local usage or general custom is indicative of due care; it is not, however, conclusive. It may be overcome by contrary expert testimony (or its equivalent) that the prevailing custom or usage itself constitutes negligence. *Cf. Turner v. General Motors Corp.* (Tex. Civ. App. 1974), 514 S.W.2d 497, 507 ("We think the [plaintiff's] expert's condemnation of the [entire] industry for its failure to install roll bars constitutes a sufficient showing that the custom itself was unreasonably dangerous.")

██ Plaintiff's own medical expert, Dr. Streeter, stated in his deposition that the TUR was performed by the defendants in accordance with the prevailing standard of care in the medical community. While we agree that Dr. Streeter's testimony is only evidence of due care, and not *necessarily* conclusive, plaintiff has not presented any expert testimony or any evidence whatsoever, in the seven years this suit has been on file, to

support the proposition that the prevailing standard of care itself constitutes negligence. Consequently, in our view, the trial court properly entered summary judgment for the defendants. See Prosser, Torts §32, at 165 n.63; §33, at 168 n.90 (4th ed. 1971); *Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill. App. 2d 461, 235 N.E.2d 671.

### III

Plaintiff's invocation of the *res ipsa loquitur* doctrine is also of no avail. In a *res ipsa loquitur* case an inference of negligence arises from circumstantial evidence. (*Cobb v. Marshall Field & Co.* (1959), 22 Ill. App. 2d 143, 159 N.E.2d 520.) Three elements must be satisfied, however, before this inference of negligence will arise:

> (a) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence;
>
> (b) it must be caused by an agency or instrumentality within the exclusive control of the defendant;
>
> (c) plaintiff must be free from contributory negligence.

Prosser, Torts §39, at 214 (4th ed. 1971); *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 207 N.E.2d 305.

■■ The requirement that the injury be of a type that does not normally occur in the absence of negligence is another way of saying that the injury must be such that one could reasonably infer from common experience that negligence was its cause. This common experience may lie in the common knowledge of laymen or may be shown by expert testimony that such an event usually does not occur without negligence. *Walker v. Rumer* (1978), 72 Ill. 2d 495, 381 N.E.2d 689; Restatement (Second) of Torts §328D, comment d, at 158-59 (1965); 1 Speiser, Res Ipsa Loquitur §2.8 (1972).

In this case, whether plaintiff's air embolism (and resultant cardiac arrest), is the type of injury from which it could reasonably be inferred from common experience that negligence was its cause, does not fall within the common knowledge of laymen but must be shown through expert medical testimony. Dr. Streeter explained that air embolisms are a recognized and reported risk of the TUR surgical procedure. They can occur as a "normal happenstance" during a TUR. Dr. Streeter also stated that plaintiff's TUR was performed in accordance with the prevailing standard of care and that no professional negligence was involved.

■■ Proof of a bad result or mishap is not, in and of itself, evidence of lack of skill or negligence (*Crawford v. Anagnostopoulos* (1979), 69 Ill. App. 3d 954, 387 N.E.2d 1064; *Hoover v. Buckman* (1915), 194 Ill. App. 308 (abstract)), and it will not, standing alone, support a *res ipsa loquitur* cause of action (*Spidle v. Steward* (1979), 68 Ill. App. 3d 134, 385 N.E.2d 401). In light of the above circumstances, we find that plaintiff's

invocation of the *res ipsa loquitur* doctrine does not preclude the entry of summary judgment for the defendants. *Brainerd v. Kates* (1979), 68 Ill. App. 3d 781, 386 N.E.2d 586.

## IV

In an attempt to avoid the trial court's entry of summary judgment for the defendants, plaintiff attacks the deposition testimony of Dr. Streeter. Plaintiff initially contends that Dr. Streeter was improperly asked his expert opinion on the ultimate issue in this case, namely whether there was professional negligence involved in the TUR surgical procedure. This contention is without merit. It was proper for the defendants to elicit Dr. Streeter's expert opinion on the ultimate issue in this case. *McCallister v. del Castillo* (1974), 18 Ill. App. 3d 1041, 310 N.E.2d 474.

Plaintiff next contends that Dr. Streeter's testimony is "incompetent" because it was not based upon a proper hypothetical question. By failing to raise this objection in the course of the deposition (Ill. Rev. Stat. 1977, ch. 110A, par. 211(c)(2)), the motion for summary judgment, or the motion for reconsideration, plaintiff has waived it. Finally, plaintiff contends that Dr. Streeter's deposition testimony was improperly based on hospital and medical records (furnished to him by plaintiff's own attorney) which were not authenticated. In view of the fact that an expert's trial testimony may be based on medical records not admitted into evidence (*People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171), we find this contention to be without merit.

## V

We agree that trial courts, in medical malpractice cases, should be extremely cautious in granting a defendant summary judgment on the basis that plaintiff has failed to secure expert medical testimony necessary to support his cause of action. "The reluctance of the members of the medical profession to testify against a fellow disciple of Aesculapius makes the search for a medical expert very difficult in most cases and well-nigh impossible in some cases." (*Sanders v. Frost* (1969), 112 Ill. App. 2d 234, 241, 251 N.E.2d 105, 108.) Accordingly, trial court should afford such a plaintiff every reasonable opportunity to secure the services of a medical expert. See *Plost v. Louis A. Weiss Memorial Hospital* (1978), 62 Ill. App. 3d 253, 378 N.E.2d 1176; *Treadwell v. Chiakmakis* (1978), 61 Ill. App. 3d 125, 377 N.E.2d 1164; *Bullistron v. Augustana Hospital* (1977), 52 Ill. App. 3d 66, 367 N.E.2d 88; see also *Bell v. Board of Education* (1979), 67 Ill. App. 3d 402, 385 N.E.2d 84.

Nevertheless, this does not mean that summary judgment was inappropriate in this particular case. As the appellate court stated in *Hill*

*v. Lutheran Hospital* (1978), 58 Ill. App. 3d 1003, 1008, 374 N.E.2d 1147, 1151:

> "We agree that if there is any sound basis to do so, a trial court should reject summary judgment in this type of case. Where, however, the record indicates that plaintiff has [had] every opportunity to establish his case and has failed to demonstrate that he could show negligent acts or omissions * * * [on the part of the] defendant by expert medical testimony, where the issue is clearly one which cannot be determined by laymen alone, summary judgment could be allowed."

Accord, *Stevenson v. Nauton* (April 23, 1979), 71 Ill. App. 3d 831, 390 N.E.2d 53; *Kwak v. St. Anthony DePadua Hospital* (1977), 54 Ill. App. 3d 719, 369 N.E.2d 1346; *Sanders v. Frost* (1969), 112 Ill. App. 2d 234, 251 N.E.2d 105; see *Brainerd v. Kates* (1979), 68 Ill. App. 3d 781, 386 N.E.2d 586; *Coleman v. Verson Allsteel Press Co.* (1978), 64 Ill. App. 3d 974, 382 N.E.2d 36.

In light of the facts presented by this case, we are compelled to conclude that the trial court properly entered summary judgment for the defendants. Accordingly, we affirm the judgment of the trial court.

Affirmed.

JIGANTI, P. J., and JOHNSON, J., concur.