TERRI L. JONES, Adm'r of the Estate of Brandy Lee Jones, Deceased, Plaintiff-Appellee, *v.* RICHARD W. KARRAKER, M.D., Defendant-Appellant.

Third District   No. 81—744

Opinion filed September 21, 1982.—Rehearing denied October 21, 1982.

Stuart R. Lefstein, of Katz, McAndrews, Durkee, Balch & Lefstein, of Rock Island, and James E. Whitmire, Jr., of McGehee, Boling & Whitmire, Ltd., of Silvis, for appellant.

Michael J. Warner, of Braud, Warner, Neppl & Westensee, of Rock Island, and Stephen S. Buckley, of Peoria, for appellee.

JUSTICE ALLOY delivered the opinion of the court:

The defendant, Dr. Richard Karraker, appeals from the judgment of the circuit court in this medical malpractice action against him. The action was brought, for recovery under the Wrongful Death Act (Ill. Rev. Stat. 1979, ch. 70, pars. 1 through 2.2), by Terri Jones, administrator for the estate of Brandy Lee Jones. Terri Jones was the

mother of Brandy Jones, and the action was based on the death of the unborn fetus. The jury returned a verdict against the defendant in the amount of $125,000. On appeal, the defendant argues (1) that the court erred in refusing to admit into evidence the evidence deposition of one of the defense's expert witnesses; (2) that the jury's verdict was excessive as a matter of law; (3) that the court improperly granted plaintiff's motion *in limine* excluding all references to the putative father; and (4) that the defendant, as a matter of law, is not liable because he used his best judgment in an emergency situation.

A brief recitation of the salient facts will suffice, with any further development of the factual background to be presented as necessary during analysis of the issues. Plaintiff Terri Jones became pregnant in January 1978 when she was 18 years of age. It was her first pregnancy. She contacted Dr. Richard Karraker, the defendant, in July of that year, and he became her obstetrician. Her first visit with the doctor occurred in mid-July, and during the examination the doctor noted a potential problem resulting from the below normal size of Terri Jones' pelvic area. The doctor indicated that cesarean section was a possibility, due to the mother's pelvic size, and he also noted that October 22 was the expected date of delivery. Office visits between July and November occurred, and a pelvimetry exam (X ray of the mother's pelvis) was made, indicating that it would be very risky for the baby to pass through the delivery canal in a normal fashion. Neither a glucose tolerance test to determine diabetes, a condition often associated with larger babies, nor an ultrasound test, which would have indicated the size of the baby, was utilized by the defendant doctor, though both were available.

On November 21, 1978, almost four weeks past the expected delivery date of the baby, plaintiff Terri Jones admitted herself to Moline Public Hospital, in labor. Two weeks past term is indicative of potential problems with delivery. It was established that prior to admission, Dr. Karraker had determined that the baby was above average in size, and that a normal delivery would put both baby and mother at high risk. This was again confirmed during his initial examination at the hospital, although he found the initial dilation to be "fairly good" and the baby's heart tone good. Although faced with a high risk delivery, and aware of the potential problems with a normal delivery, the doctor nevertheless did not alert nurses or hospital personnel to schedule a cesarean section. Neither did he order fetal monitoring for the baby, which would have registered the baby's condition on a continuous basis. The doctor left the hospital after the examination, which occurred around 8:30 a.m., and returned to his office. He

checked with the hospital several times during the morning to inquire of the patient's progress in labor.

At approximately noon, the doctor returned to the hospital, where he found the baby's heart tones had begun to drop alarmingly. The baby was in distress, and the mother was removed to the delivery room. No cesarean section was ordered at that time, the doctor testifying at trial that he felt there was insufficient time for the procedure. At 12:16 p.m., a prolapsed cord was noted. This is a condition where the umbilical cord becomes compressed between the baby and the mother's pelvis. Dr. Karraker attempted to push the baby back up the birth canal and off the cord. He was unsuccessful, as the baby was stuck, being too large for the mother's pelvis. The doctor then attempted to remove the baby from the womb, through the use of forceps, but he was unsuccessful. The last heartbeat of the fetus was noted at 12:35 p.m. In order to remove the dead fetus through the normal birth canal, the shoulders had to be broken. At trial, Dr. Karraker admitted that had a cesarean section been performed at 12 noon, there was nothing to suggest that the mother would have had anything other than a normal, live baby.

The plaintiff presented two expert witnesses to establish the lack of care on the part of Dr. Karraker in his handling of this pregnancy and this delivery. In addition, several of the attending nurses testified for the plaintiff. The nurses testified that they were not instructed by the doctor to present the plaintiff with a surgical consent for cesarean section, and that the doctor did not alert them to the possibility of cesarean section. One nurse further testified that electronic fetal monitoring was available at the hospital at that time, but Dr. Karraker did not order it in this case. The plaintiff's experts testified, in detail, that the doctor failed to meet the standards of care applicable to him in this case, in that (1) he failed to adequately evaluate the baby, as to its size and health, and that (2) he failed to perform the cesarean section at a proper time, where there was a documented and recognized disproportion between the size of the baby and the size of the birth canal. The experts discussed at length the tests which should have been administered to adequately evaluate the baby, and their conclusions that not performing the cesarean section earlier was a deviation from accepted and applicable standards of practice for obstetricians.

The defendant doctor testified and, in addition, the expert testimony of another obstetrician was presented. While admitting that had he performed a cesarean section at noon, the mother would likely have had a normal, live baby, the doctor stated that it was his practice of letting patients progress in labor, even in cases of cepholopelvic

disproportion, in order to check their progress. The defendant's expert witness, while concluding that he had met the requisite standards of care, did acknowledge the usefulness of the suggested, but unused, evaluative tests for the baby, and also the advisability of a cesarean section when the baby was found to be in distress. He also stated that a cesarean section could have been performed at any time after entry of the mother into the hospital in the morning. Although the evidence varied somewhat, the record indicates that had a cesarean section been ordered at noon, the baby would have been removed at or around 12:25 p.m., a full 10 minutes prior to death. In addition to the oral testimony of an expert witness, the defense also sought to introduce into evidence, the evidence deposition of another expert, Dr. Norman Powell, in which Powell concluded that Dr. Karraker had met the requisite standards of care in his care and treatment. A motion to strike the evidence deposition was filed and heard by the court. On the basis of the motion, the evidence deposition was not permitted to be introduced into evidence.

Other than its viability, the characteristics of the fetus were not presented by the plaintiff. Neither did the defense offer evidence on the question of damages. The jury was instructed that there was a presumption of pecuniary loss in the death of a minor, or fetus, and, on the evidence, as instructed, it returned a verdict for the plaintiff in the amount of $125,000. From the judgment of liability, and the damage award, the defendant now appeals.

The first issue presented is whether there was error committed by the court in refusing to permit the defense to introduce into evidence the evidence deposition of Dr. Powell. Objection was made to the deposition on the basis that Dr. Powell, in stating his conclusions, relied upon medical records that were not admitted into evidence. At the deposition, objection was made to Dr. Powell's conclusions, based upon the insufficient foundation for the medical records relied upon, and that they constituted hearsay statements not in evidence. At the deposition, defense counsel sought to introduce the hospital records without foundation, which attempt was objected to by counsel for the plaintiff. The objections were renewed in the motion to strike, after defense counsel sought to introduce the deposition at trial.

Initially, we are faced with arguments by both parties that the issue is waived by the other. We reject any waiver by either side. The defense contends that the plaintiff waived objections to the deposition by failing to specify the basis of their objection during the deposition. (73 Ill. 2d R. 211(c)(1).) However, as noted above, the record indicates that plaintiff's counsel did object to any reliance by Dr. Powell upon

the medical records, because the records had an insufficient foundation and were hearsay statements not in evidence. We find that the plaintiff did not waive the objection, that it was specific enough, and that it was properly advanced again by way of the motion to strike the deposition testimony. Plaintiff's argument, on the other hand, is that the defense waived the issue of the propriety of the judge's ruling on the deposition by failing to make an offer of proof and failing to lay an adequate foundation. The record is clear, however, that the defense offered the deposition into evidence, and it is clear as well that the trial court regarded such offer as a sufficient offer of proof, as against his denial of its admissibility. The question as to waiver by failure to lay a foundation is more troublesome, for the trial court specifically advised defense counsel that the deposition could be retendered, if the hospital records were admitted. No attempt was made to lay a foundation for their admission, however. Although we find a possible basis for application of the waiver rule by virtue of this failure by defense counsel, we nevertheless choose to address the merits of the trial court's ruling excluding the evidence deposition.

The trial court, in denying admission to the deposition, relied upon the Illinois Supreme Court case of *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322. In that case, the court changed the evidentiary law in Illinois by adopting Federal Rules of Evidence 703 and 705, which, as relevant herein, permit opinions by experts to be based upon facts not in evidence. (84 Ill. 2d 186, 193.) The court stated in the opinion that it was changing the law in Illinois, so that medical experts could testify as to their medical opinions in a case, based upon hospital records, even where the records are not admitted into evidence. However, the new rule which was adopted in *Wilson v. Clark* was given prospective application only, and the court refused to apply it to the *Wilson v. Clark* case itself. In the case before them, the court found that the trial court had committed reversible error by permitting an expert to testify as to his opinion, where it was based upon hospital records admitted without an adequate foundation. (84 Ill. 2d 186, 195-96.) The new rule announced was to be applicable to complaints or trials after September 1, 1981. Since trial in the case before us was concluded on July 31, 1981, it was not within the ambit of *Wilson's* prospective application. Rather, the rule existing prior to the change, that being the rule applied in *Wilson*, applied in the instant case. Under that rule, it was improper for an expert to base his conclusions upon hospital records not properly admitted into evidence. Thus, the trial court correctly denied admission of Powell's deposition.

The defense attempts to prevent this result by arguing that

*Wilson* did not, in fact, effectuate any change in Illinois law. It is argued that the law prior to *Wilson* was actually the law which the court announced, with prospective application, in *Wilson* itself, with reliance placed upon the case of *Chiero v. Chicago Osteopathic Hospital* (1979), 74 Ill. App. 3d 166, 392 N.E.2d 203. It is an interesting argument, but unpersuasive. The rule in Illinois prior to *Wilson* was as it was stated to be in *Wilson*, and as it was applied in *Wilson*. The Supreme Court of Illinois remains the court of last resort in the State, and the rule existing before the change in *Wilson* was that stated by the court therein, *Chiero* notwithstanding. Given that, the defense next argues that it was incumbent upon plaintiff's counsel, at the time of the deposition, to specifically inform the defense of the time limitations in the *Wilson* case, and that counsel's failure to do so constituted a waiver of the foundation and hearsay objections to Dr. Powell's deposition. We have already concluded that the objections by plaintiff's counsel were sufficiently specific. Counsel was not required to furnish the defense with copies of the cases upon which it was relying. Nor are we persuaded by defense's unfairness argument, where any reliance by plaintiff's experts on the records was unobjected to by the defense.

■ We turn next to the defense contention that the court committed reversible error in granting the plaintiff's motion *in limine,* preventing defense counsel from eliciting or attempting to elicit testimony or evidence concerning the father of the deceased fetus, or the fact that the plaintiff was not married during her pregnancy. The defense, which objected to the restrictions on numerous occasions, argues on appeal that by preventing mention of the father, the jury was prejudiced in the plaintiff's favor. In their briefs, a principal argument between the parties is on the question of whether, under the Wrongful Death Act, an illegitimate father is "next of kin," so as to be entitled to a share of any judgment award, based upon his loss. While an interesting question, it is not properly before us in the instant case, for the father, so far as the record shows, took no part in this action, made no appearance, and made no claim to any judgment award. Thus, there is no proper issue as to whether he would be considered "next of kin" under the act, so as to be entitled to a share of the judgment award. Under the circumstances of the instant case, we find the evidence as to the father's name or existence, or the fact that the mother was unmarried, to be matters of little relevance as between these parties. What relevance such evidence would have is outweighed by the potential prejudice to the plaintiff of the jury being apprised of the illegitimacy of the infant. We find no error in the court's decision

to grant plaintiff's motion *in limine.*

■■ ■ The third issue, on the question of liability, is whether a judgment in favor of the defendant doctor should be ordered, as a matter of law, based upon his having used his best judgment under the circumstances. (See *Spike v. Sellett* (1981), 102 Ill. App. 3d 270, 430 N.E.2d 597.) As was stated in that case:

> "If a doctor has given a plaintiff the benefit of his best judgment, assuming that judgment to be equal to that ordinarily used by reasonably well-qualified doctors in similar cases, he is not liable for negligence, even if that judgment is erroneous." (102 Ill. App. 3d 270, 273.)

The difficulty with application of this rule in the instant case, as suggested by defense counsel, is that there was sufficient evidence in the record to establish that Dr. Karraker's judgments (not to use fetal monitoring and not to proceed expeditiously with the cesarean section) were not judgments equal to those ordinarily used by reasonably well-qualified doctors in similar situations. There was a question of fact on the issue, and we will not disturb the jury's resolution of that question. The evidence was sufficient to establish that by his acts and omissions Dr. Karraker breached the medical standards of care applicable to him in the circumstances of this case.

The final issue, and the most troublesome one, is that concerning the size of the verdict. The defense contends that the jury's award of $125,000 was excessive and the product of passion and prejudice. The plaintiff argues that the jury was properly instructed and that the question of damages is peculiarly for the jury to decide. In the instant case, the record shows that the only evidence before the jury on the question of damages was the fact that the fetus was viable and that, absent defendant's malpractice, the evidence indicated that the plaintiff would have had a normal, healthy baby. The plaintiff's counsel chose not to present other evidence of the baby's characteristics, and it is questionable what value such evidence (baby's sex or average human life expectancy) would have had. The more usual considerations, physical and mental characteristics and habits of industry, are largely unavailable in the case of the death of an unborn but viable fetus. In this case, plaintiff essentially relied upon the rebuttable presumption of pecuniary loss which is applicable in cases of the death of a minor, or unborn but viable fetus. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237.) The defense, for its part, offered no evidence in rebuttal, which is also understandable, since it did not dispute the evidence of viability or that the baby would have been healthy. It had no counter evidence on the question of pecuniary losses. The result is a substan-

tial verdict based almost entirely upon the presumption of pecuniary loss. In reality, there is really nothing herein in the way of supporting evidence relating to the pecuniary loss suffered from this death. The question before this court is whether, on the basis of the record, this verdict should be affirmed or reversed, with a remittitur.

Problems in this area were anticipated, but left unresolved, by the Illinois Supreme Court when it construed the Wrongful Death Act as applying to the deaths of viable but unborn fetuses. (*Chrisafogeorgis v. Brandenberg* (1973), 55 Ill. 2d 368, 304 N.E.2d 88 (majority opinion and dissent).) The difficulty in this area with damages has also been apparent in cases involving the death of infants and other very young children. While the statutory scheme provides compensation to the next of kin for pecuniary losses as a result of a wrongful death, it is extremely difficult to provide satisfactory evidence directed to the issues of earning power and probable contribution to the parents, in the case of an infant or young child. Therefore, as noted, the courts have created a rebuttable presumption of pecuniary loss, which is usually accompanied by some supporting evidence. The supporting evidence, for the most part, however, often has little or no affirmative relevance to the issues, being anticipated earning power and probable contribution to the parents. That an infant or young child was a healthy, well-behaved and industrious child, with a long life ahead of him, provides little in the way of specific direction or guidance to the jury, faced with the question of pecuniary loss to the parent or parents. On the other hand, negative characteristics, if they may be so termed, are better guides, for where the defense rebuts the presumption with evidence that the child was unhealthy, or unlikely to live beyond minority, then such evidence may bear specifically and directly on questions of earning capability and potential for contribution. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 238-39.) In the more common case, that is where there is the presumption plus supporting evidence of a healthy, alert and well-behaved child, in fact, such evidence adds little in the way of foundation to the jury's determination as to pecuniary loss, based upon earning power and contribution. Such supporting evidence, if it serves a purpose, is useful in that it affords trial judges or reviewing courts something in the record to rely upon when leaving the question to the sound discretion of the jury. The truth in this area, and one based upon wise policy, is that wide latitude is given fact-finders on damages, and where there is a reversal by a reviewing court, it is often not based upon a specific evidentiary basis, but upon a conclusion, within its discretion, that the award was simply too high or too low.

■■ With these considerations in mind, and accepting that the presumption of pecuniary loss alone establishes a *prima facie* case of damages, which the defendant may rebut (*Flynn v. Vancil* (1968), 41 Ill. 2d 236), and that damages are peculiarly for the jury, we turn to the issue in the case at bar.

In 1964, this court, in *Maca v. Rock Island-Moline City Lines, Inc.* (1964), 47 Ill. App. 2d 31, 197 N.E.2d 463, affirmed a $30,000 verdict, the maximum allowable at the time, for the wrongful death of a seven-year-old child, where the supporting evidence indicated that the boy was healthy, average, well-behaved and industrious, with his entire life ahead of him. In the instant case, almost 15 years and several inflationary spirals later, there is nothing to indicate that the deceased baby in the instant case would have been anything but a healthy, average, well-behaved child, with his entire life ahead of him. While we may have awarded a considerably smaller sum, we find the question properly to have been for the jury, and we will not disturb its award.

We add that the question of damages in the death of a minor or an unborn fetus is one which we believe the supreme court, and the legislature, should address, and we urge the Illinois Supreme Court to review the question presented.

Affirmed.

SCOTT and HEIPLE, JJ., concur.